(No. 84049

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DENNIS EMERSON, Appellant.

*Opinion filed February 17, 2000.—Modified on denial of rehearing April 3, 2000.*

446

448

Prentice H. Marshall, Jr., Linton J. Childs, Margaret L. Fitzpatrick and Robert C. Varnell, of Sidley & Austin, of Chicago, for appellant, and Dennis Emerson, of Menard, appellant *pro se.*

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

In 1985, defendant was convicted of the murder and armed robbery of Delinda Byrd, as well as the attempted murder and armed robbery of Robert Ray. A jury found defendant eligible for the death penalty based on Byrd's murder and found no mitigating factors sufficient to preclude the imposition of the death penalty. Pursuant to defendant's petition for a writ of *habeas corpus*, the United States District Court for the Northern District of Illinois ordered that defendant receive a new sentencing hearing. *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225 (N.D. Ill. 1995). The federal appellate court affirmed the district court. *Emerson v. Gramley*, 91 F.3d 898 (7th Cir. 1996).

The circuit court of Cook County held a new sentencing hearing, at which a jury again found defendant eligible for the death penalty and found no mitigating factors sufficient to preclude the imposition of the death penalty. The propriety of that sentence is now before this court pursuant to defendant's direct appeal. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603. Defendant's death sentence has been stayed pending our review. 134 Ill. 2d R. 609(a).

BACKGROUND

This case is before this court for the fourth time. The procedural history of the case begins in the early 1980s, when defendant was tried for the 1979 murder and armed robbery of Byrd, the attempted murder and armed robbery of Ray, and aggravated arson. A jury convicted defendant of these offenses and imposed the death penalty for Byrd's murder. On direct review, however, this court found that defendant was denied a fair trial based on (1) the admission at trial of a prior consistent statement by Ray and (2) improper comments by the prosecution during closing argument. This court reversed

defendant's convictions and sentence and remanded the cause for a new trial. *People v. Emerson,* 97 Ill. 2d 487 (1983) *(Emerson I).* On remand, a jury again convicted defendant of murder, attempted murder, armed robbery and aggravated arson and imposed the death penalty. Pursuant to defendant's direct appeal, this court reversed his conviction for aggravated arson but affirmed his other convictions and death sentence. *People v. Emerson,* 122 Ill. 2d 411 (1987), *cert. denied,* 488 U.S. 900, 102 L. Ed. 2d 235, 109 S. Ct. 246 (1988) *(Emerson II).* The circuit court dismissed defendant's subsequent petition for relief under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1987, ch. 38, par. 122—1 *et seq.* (now 725 ILCS 5/122—1 (West 1996))) without an evidentiary hearing, and this court affirmed that dismissal. *People v. Emerson,* 153 Ill. 2d 100 (1992), *cert. denied,* 507 U.S. 1037, 123 L. Ed. 2d 485, 113 S. Ct. 1865 (1993) *(Emerson III).*

The federal district court granted in part defendant's petition for a writ of *habeas corpus.* The court rejected defendant's claim that he received ineffective assistance of counsel at trial but remanded the cause for a new sentencing hearing after finding that defendant failed to receive the effective assistance of counsel at sentencing. *United States ex rel. Emerson v. Gramley,* 883 F. Supp. 225 (N.D. Ill. 1995) *(Emerson IV).* The United States Court of Appeals for the Seventh Circuit affirmed the district court. *Emerson v. Gramley,* 91 F.3d 898 (7th Cir. 1996) *(Emerson V), cert. denied,* 520 U.S. 1122, 137 L. Ed. 2d 339, 117 S. Ct. 1260 (1997).

On remand, at the eligibility phase of defendant's sentencing hearing, Robert Ray testified that, in 1979, he and his cousin owned the Centaur Lounge at 1154 West 69th Street in Chicago. On Sunday, August 12, 1979, Ray opened the lounge at noon. During the day, he received three or four telephone calls from defendant. Defendant's brother Ricky Jackson had introduced Ray to defendant,

and Ray had known defendant for about a year. When he called, defendant indicated that he planned to visit Ray at the lounge that day. Because business was slow, Ray closed the lounge early, at around midnight or 1 a.m.

Before Ray closed the lounge, he received another telephone call from defendant, during which defendant told him that he still planned to visit. After the lounge was closed, defendant arrived with his brother Richard Jackson (Jackson). Although Ray knew defendant's brother Ricky, he had never met defendant's other brother, Richard. Ray opened the door and security gate for defendant and Jackson, and the three men walked to the apartment in the rear of the lounge.

Ray explained that he rented this apartment, which was accessed by a door behind the bar in the lounge. Inside the apartment were two bedrooms, a bathroom, and a kitchen. In the bedroom where Ray slept, there was a window that opened onto an air shaft between the apartment and the neighboring building. The window in the other bedroom was covered with boards.

Soon after the three men sat down in the kitchen area of the apartment, Ray's girlfriend, Delinda Byrd, arrived. After Byrd's arrival, Ray left the apartment to go across the street to buy a package of cigarettes. When he returned, the group continued to talk in the kitchen area. Ray could not remember if they had anything to drink and could not remember much about their conversation, except that he told defendant and Jackson that the lounge had not yet started to "pay off."

During their conversation, Ray turned to look at defendant and saw that defendant had a gun pointed at him. Defendant told Ray that it was a robbery or a stick up. Defendant then made Ray and Byrd lie facedown on the floor and tied their hands and feet with electrical cord he took from a lamp.

Defendant then searched Ray and Byrd and took the

money they were carrying. Afterward, he emptied the cash register in the lounge. When he returned to the apartment, defendant asked Ray if he had any guns. Ray told him that there were two guns in the closet of his bedroom, and defendant went into the bedroom to retrieve the guns. Defendant then walked back and forth transporting other items from the apartment into the lounge. While defendant tied Ray and Byrd, emptied the cash register, and removed items from the apartment, Jackson sat on a desk in the apartment and pointed a gun at Ray and Byrd.

After defendant stopped moving items from the apartment to the lounge, Ray heard Jackson say "use this" to defendant. Ray could not see what Jackson was referring to at the time because he was lying on his stomach, but then defendant stood over him with the half pair of scissors that Ray used to operate a broken doorknob in the apartment. Defendant lifted Ray's shoulder from the ground and stabbed him twice in the chest with the scissors. Jackson was still sitting at the desk holding the gun during Ray's stabbing.

Ray lay very still after defendant stabbed him until he saw defendant stand over Byrd. When he realized that defendant "was about to do the same thing to her," Ray begged him not to do it. Defendant turned and gave Ray a "real evil" look. Ray did not actually see defendant stab Byrd because he looked away as he saw defendant swing his hand holding the scissors in a downward motion toward Byrd.

Next, Ray heard defendant walk past him into Ray's bedroom. Ray did not recall whether Jackson accompanied defendant into the bedroom. Defendant stayed in the bedroom for a minute or two. When he exited the room, defendant and Jackson lifted Ray and threw him into the bedroom, which was now on fire. Defendant and Jackson then threw Byrd on top of Ray. They closed the

door, and Ray heard a noise as if they were fastening the doorknob. After the noise stopped, Ray untied his hands and tried to open the door but could not. Ray then opened the window in the bedroom and fell into the air shaft. Byrd, who was able to follow him, fell on top of him. Ray then untied his feet and untied Byrd's hands and feet.

After freeing himself and Byrd, Ray reentered the bedroom and again tried unsuccessfully to open the bedroom door. He then climbed back into the air shaft, where he opened the kitchen window. The smoke and heat coming from the kitchen, however, made him immediately close that window. He and Byrd screamed for help, after which Ray stood on the kitchen window sill and "kicked in" an air conditioner and some plasterboard from a window leading from the air shaft to the lounge. He and the air conditioner fell into the lounge. Ray exited the lounge through the front door. After learning that neighbors had called the fire department, he attempted to reenter the lounge, but the smoke prevented him from doing so. He then ran to the back of the building, where he could see into the air shaft through a two- or three-inch opening between the air shaft and the neighboring building. Byrd told him that it was getting hard to breathe in the air shaft, and Ray told her that he would save her. He returned to the front of the building, and he saw that the fire department had arrived. He told the firemen where Byrd was trapped but then collapsed on the ground because of his injuries.

While Ray was in the hospital, he learned that Byrd had died. The police visited Ray in the hospital and showed him a photographic array. Ray testified that he selected photographs of defendant and Jackson from the array and told police that these were the men who had robbed him and Byrd. When shown these same photographs in court, Ray again selected photographs of defen-

dant and Jackson and stated that these two men robbed and stabbed him.

Chicago police officer Gregory Stevenson testified that, around 4 a.m. on August 13, 1979, he and his partner responded to a call at the Centaur Lounge. They found Ray sitting on the curb bleeding from his chest and the lounge on fire. Ray told Stevenson that he was the owner of the lounge, that he had been robbed, and that his girlfriend was still trapped in the building. After observing that the fire department had arrived, Stevenson and his partner spoke further with Ray. Ray said that two men had robbed him, stabbed him, and set the lounge on fire. Ray identified the two men as defendant and his brother Richard Jackson. Ray described the building where the brothers lived. Stevenson and his partner went to this building, but did not find defendant or Jackson. When they returned to the lounge, the fire had been extinguished. Inside the apartment, they found a wire coat hanger wrapped around a doorknob assembly on the floor outside the bedroom. In the bedroom, they also found two electrical wires. Stevenson did not remember seeing an air conditioner at the scene. He did not know whether fingerprints or scissors were found at the scene.

Chicago firefighter Edward Barry testified that, when he arrived at the Centaur Lounge on August 13, 1979, Ray was standing in front of the building. Ray told the firefighters that Byrd was trapped in the rear of the building. When Barry went to the rear of the building, he saw Byrd in the air shaft. Because of the intensity of the fire, the firefighters were unable to remove her from the air shaft. They poured water on top of her but, by the time the fire was extinguished, Byrd had died. Based on his experience, Barry opined that the fire began in the apartment behind the lounge.

Detective Craig Cegielski testified that a warrant was

issued for defendant's arrest on August 14, 1979. Defendant was arrested on February 12, 1980.

Dr. Edmund R. Donoghue testified that he is the chief medical examiner for Cook County, and he examined the report of the autopsy performed on Delinda Byrd. The doctor who had performed this autopsy and prepared the report had passed away. Donoghue explained that there were second- or third-degree burns over 90% of Byrd's body. The deposits of soot in her larynx and trachea, as well as the amount of carbon monoxide in her blood, indicated that she was alive when the fire began. The report also stated that Byrd had five stab wounds to her back. According to the autopsy report, Byrd died of multiple stab wounds to her back, and the burns to her body were a "significant contributing condition" to her death. The immediate cause of her death was the stab wounds, but an unrelated condition that contributed to her death was the burns. Dr. Donoghue concurred in the report's conclusion with respect to the cause of Byrd's death. In Donoghue's opinion, one instrument could have caused all of Byrd's stab wounds, and it was possible that the wounds were caused by scissors.

At the conclusion of its case at the eligibility hearing, the State presented evidence that, in 1985, a jury had returned guilty verdicts against defendant for the murder and armed robbery of Byrd and the attempted murder and armed robbery of Ray. In addition, the State presented a stipulation that defendant was born on September 26, 1951.

The defense presented no evidence at the eligibility hearing. Instead, defendant made a motion for a directed finding. The circuit court denied this motion. The jury returned a verdict finding defendant eligible for the death penalty under the felony murder statutory aggravating factor. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6) (now 720 ILCS 5/9—1(b)(6) (West 1996)). The circuit court

denied defendant's motion for judgment notwithstanding the verdict.

At the aggravation-mitigation phase of defendant's sentencing hearing, the State presented the following evidence: David Heim testified that he was working as a clerk in a camera store on March 13, 1975. That morning, defendant entered the store and placed a camera on layaway. Around noon, defendant returned to the store, pointed a gun at Heim, and demanded the money in the cash register. Defendant took this money, as well as the paper documenting the layaway. He then pushed Heim to the back of the store, where the manager was processing a bank deposit. Defendant also took the money that was to be included in the deposit and exited the back of the store.

Ronald Parram testified that, on February 27, 1971, he was working as an assistant manager in a shoe store. A few minutes before the store closed, defendant entered the store and asked for change for a $10 bill. When Parram opened the register, defendant placed a gun to his head and said, "[T]his is a stickup." Defendant removed the money from the register and also asked the customer in the store for his money. Defendant then exited the store and hailed a cab. Parram followed defendant and, when the cab stopped at a stop sign, Parram wrestled the gun from defendant and held him until police arrived.

Detective Thomas Duffy testified that, on April 13, 1971, he and his partner were on patrol in an unmarked police car when they observed a young man driving a Cadillac in a parking lot across from the criminal courthouse at the intersection of 26th and California in Chicago. By comparing the license number to their "hot sheet," they discovered that the car was stolen. They arrested defendant, who was driving the car. Duffy learned that the car had been stolen on April 9, 1971, from Harold Guberman. The keys to the car had been taken on

January 30, 1971, during an armed robbery of Guberman's store. On February 8, 1971, Guberman had been robbed again at gunpoint by defendant while walking to his car after closing his store. Guberman had identified defendant as the robber in a lineup.

Lieutenant James Devereaux testified that, at about 9:50 p.m. on February 11, 1980, he and his partner were working in an unmarked car when they responded to a call of a suspicious man. The man, whom Devereaux identified as defendant, was standing on the corner of Broadway and Addison looking down those streets in all four directions. The drugstore at the corner of this intersection closed at 10 p.m. The officers approached defendant and performed a pat-down search after seeing a bulge in his waistband. They found a .38-caliber fully-loaded revolver. Defendant told them that his name was Micky Johnson. After arresting defendant, Devereaux learned that the gun had been stolen on October 21, 1979. He also learned that defendant was wanted in connection with Byrd's murder.

In addition to this testimony, the State presented seven certified copies of conviction. These documents indicated that, in 1970 and 1971, in the circuit court of Cook County, defendant pleaded guilty to three armed robbery offenses, grand theft, and robbery. For each of these offenses, he received a sentence of four to eight years' imprisonment, to run concurrently. In June 1975, defendant pleaded guilty in federal court to knowingly receiving and possessing money stolen from a federally insured bank and to unlawfully using a firearm to commit felonies. Defendant was sentenced to a total of five years' imprisonment for these federal convictions. On February 23, 1976, in the circuit court of Cook County, defendant pleaded guilty to armed robbery and received a sentence of five to eight years' imprisonment, to run concurrently with his federal sentence. On July 24, 1979,

less than a month before Byrd's murder, defendant was released from prison on parole.

As mitigating evidence, the defense presented the testimony of Jill Miller, a forensic social worker, whom the defense had retained to prepare a social history of defendant. In preparing this history, Miller reviewed police reports, defendant's criminal history, and other records. She interviewed defendant, his family members, and his friends. According to Miller, defendant was born in 1951 in rural Missouri. Defendant was the fourth of six children. The family moved to Chicago when defendant was about four years old. Shortly after this move, defendant's father left the family. Defendant's mother, whom relatives described as illiterate, did not work when defendant was a child and used welfare to support the family. According to Miller, defendant's mother was loving but seemed cognitively impaired and did not enforce limits with respect to her children's behavior.

In 1958, defendant's oldest brother died of cancer. In 1960, when defendant was eight years old, defendant was shot in the abdomen during an armed robbery of the grocery store where he worked. After the shooting, defendant was unable to complete the school year. He fell behind in school and had to repeat the second grade when he was nine years old. He was afraid to leave the house and became a truancy problem, as a result of which he was placed in a special school for truant children.

When he was 11 years old, he was placed in a residential school for truant children. He was assigned to the fourth grade even though other children of his age were in the sixth grade. As the result of an act of sexual misconduct at the residential school, defendant was adjudicated delinquent and transferred to the custody of the Illinois Youth Commission in 1963. He spent his teenage years in and out of juvenile correctional facilities. His conduct and adjustment in these facilities was good, and he was frequently paroled.

He was repeatedly returned to the facilities, however, for truancy, parole violations, or his mother's inability to control him. For example, he was returned to one of the facilities in 1966 because his mother could not control him. Two months after he was paroled in August 1966, he was arrested for burglary and again returned to a Youth Commission facility. At the end of 1968, he was absent without leave from a facility. One month later, he was arrested for petty theft and disorderly conduct.

During the summer of 1968, defendant was placed in a vocational welding program, but he was removed from the program when he missed classes due to oversleeping. Subsequently, defendant was placed in a work release program with Caterpillar in Joliet, where he worked until December 1969. At that time, however, he was paroled to Chicago, even though he had requested to be paroled elsewhere on the basis that Chicago was not a good environment for him.

Testing in 1964 showed that defendant had an IQ of 80, which is low-average or on the borderline of mental retardation. A later test showed that his IQ was 87. Testing in 1965 indicated that defendant had a learning disability. Counseling was recommended but not provided. The highest grade in which defendant was placed was fifth grade. His highest functioning level was fourth grade. He was unable to pass the general equivalency diploma examination.

Defendant was formally paroled from the Youth Commission in February 1970. In August of that year, he was arrested for an armed robbery at an insurance agency. He was released on bond. Three months later, he committed his first armed robbery of Guberman. He was arrested in February 1971 for the shoe store robbery but was released on bond in March, shortly after the death of his daughter. In April, he was arrested for stealing Guberman's car. He pleaded guilty to these offenses and

was incarcerated. He was released on parole in December of 1974. In March 1975, he robbed the camera store. After pleading guilty to that offense, he was again incarcerated. He was released on July 24, 1979.

During the 1970s, defendant spent most of his time in prison, where he did well in work assignments and adjusted well. While in prison in 1975, defendant was married, but he was divorced two years later. He has been in prison since 1980 for the offenses at issue in this case. His prison records during his most recent incarceration show that his adjustment has been positive, he follows rules, he is respectful to staff and to others, and he occupies his time constructively. He had an assignment working in the prison laundry, got married, and spent his free time crocheting and knitting gifts.

Various prison staff members testified with respect to defendant's behavior in prison during the 1990s. Marvin Skidmore, a captain at the Pontiac Correctional Center, testified that he had known defendant since 1990, although he did not have close contact with him until January 1997. Skidmore testified that he supervises inmates' movements when they are outside their cells. Since January 1997, he had supervised defendant's work in the prison laundry. Before he could work in the laundry, defendant had to apply for this job, and his application had to be approved by numerous prison officials. Defendant picked up inmates' laundry, washed it, and returned it. He worked seven days a week, although he was paid for only five days a week. He made $25 a month doing laundry. Defendant enjoyed certain privileges as a result of his laundry job. When he was out of his cell performing his job, he was not placed in handcuffs, although a guard checked on him every hour. There were very few complaints about defendant's work in the laundry, and he never had any problems with the guards or other inmates. The job would have been taken from him immediately if he had caused any trouble.

Another guard, Jill Ann Beatty, testified that she worked in the condemned unit of the prison for most of the period between September 1988 and the present. Defendant had given her no problems, and he treated her better than did other inmates. In his spare time, he made jewelry boxes, knitted, and crocheted. According to Beatty, defendant behaved the way she would want all of the inmates to behave. He was polite, smiled, and cared about his job.

Frances Childress testified that she had known defendant since 1992, when he started in his laundry position. She was a correctional clerk in the condemned unit, and her office was next to the laundry where defendant worked. He made coffee for her in the morning, gave her poetry he had written, and asked about her family. She described him as a friend and an excellent worker. She called him by his nickname, "M.O." In his spare time, he made jewelry boxes, afghans, and pillows to give as gifts or to sell.

Joni Stallman testified that she met defendant in 1992 when she was working as a paralegal in the condemned unit at Pontiac. She would see him a few days a week. He was very kind and polite and helped her carry books.

Reverend Eldon Kendall testified that he had known defendant since he began working as a chaplain at Pontiac in 1988. According to Kendall, defendant was one of the easiest inmates "to get along with." Kendall married defendant and his wife, Patricia, and helped them renew their wedding vows on their first anniversary. Kendall testified that defendant always reminded him when the date of their anniversary was approaching.

In addition to the testimony of these prison staff members, there was testimony from several individuals with whom defendant had corresponded while in prison. Harold Gullett testified that he began corresponding with

defendant in 1987. Defendant's letters were kind, considerate, and contained discussions of his faith. They did not discuss the reason he was in jail. Harold and his wife had received birthday and holiday cards from defendant, as well as gifts, including a scarf, a stocking cap, and western shirts with their names cross-stitched on them. The work on these crafts was very well done. According to Harold, defendant seemed articulate, well-read, of above-average intelligence, and well-versed in the written word, such as the Bible. Harold stated that defendant was a living example of a person who had made lemonade with the lemons the world handed him. Testimony by Harold's wife, Marjorie, was similar. She added that, when defendant learned that she needed major surgery, he asked if there was anything he could do to help. He offered to give her anything that she needed. Marjorie interpreted this as an offer of blood or an organ. Neither Harold nor Marjorie knew why defendant was in prison, but Marjorie testified that the knowledge that defendant could be good under his circumstances had enriched her life.

Jana Minor testified that she corresponded with defendant from the early 1980s until 1990. She had also visited him in prison. Minor stated that defendant had shown concern for her and her family and had crocheted a cape for her.

Lynn Bones testified that she began corresponding with defendant in the early 1980s. They exchanged over 100 letters. During the time that they corresponded, defendant's letter writing improved. Defendant's views seemed well thought out. He enriched her life by teaching her that individuals in jail were not necessarily bad. Defendant gave her a jewelry box he had made for her birthday and an afghan.

Donald Wheat testified that he had corresponded with defendant for 10 years. He was impressed with the qual-

ity of defendant's letters, thoughts, and philosophy of life. Defendant had sent Wheat items that he had made, such as afghans. Wheat would sell these items for defendant and give him the proceeds. He learned from defendant that people can change.

Defendant's wife, Patricia Emerson, testified that she lives in London and first met defendant in 1992 through correspondence. In their correspondence, they discussed Patricia's friends, her job as a school teacher, her hobbies, her interests in mathematics and philosophy, defendant's interest in learning Spanish, his crafts, and his interest in painting. They were married in 1993. Since that time, Patricia Emerson had visited defendant 18 times. She was able to spend about 50 days a year visiting defendant. Patricia Emerson stated that, after she retires, she plans to move to the United States to be with defendant. Defendant had given her many gifts that he made, including a poncho, a jacket with a hood, and a jewelry box. According to a previously prepared statement Patricia Emerson read to the jury, defendant had taught her to see the good in people and not to criticize others. She testified that defendant had offered an organ to Marjorie Gullett. Patricia Emerson further testified that defendant had changed in the past few years by becoming better able to express his feelings and had written poetry for her.

After hearing this evidence, the jury found no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court entered judgment sentencing defendant to death on August 19, 1997.

## ANALYSIS

Defendant argues that his death sentence must be reversed and the cause remanded for the imposition of a sentence other than death because (1) the circuit court failed to comply with the federal court order remanding the case for resentencing within 120 days; (2) the jury

verdict finding him eligible for the death penalty was not supported by the evidence at the sentencing hearing; (3) his death sentence is excessive based on the evidence presented at the aggravation-mitigation stage of sentencing; (4) his death sentence is disproportionate when compared to sentences received by his codefendant and by defendants in other cases; and (5) the Illinois death penalty statute is unconstitutional on its face and as applied to defendant. Alternatively, defendant contends that errors at both the eligibility and aggravation-mitigation stages of sentencing require that he receive a new sentencing hearing. Finally, defendant challenges the performance of his counsel at his 1985 trial.

## I. Presentencing Issues

### A. *Compliance With the Federal Court Mandate*

We begin by addressing defendant's claim that the circuit court lacked jurisdiction to sentence him because it failed to do so within the time period required by the federal courts. The federal district court mandate provided: "Emerson's petition for *habeas corpus* is granted with respect to this sentence of death and denied in all other respects. The state is ordered to resentence petitioner pursuant to the dictates of the Sixth Amendment within 120 days of the date of this order." The order was dated March 30, 1995. On July 30, 1996, the federal appellate court affirmed the federal district court. *Emerson V*, 91 F.3d at 907. On October 4, 1996, the federal district court issued an order that provided, "The 120-day period for Emerson's resentencing shall run from the date on which the supreme court disposes of Emerson's petition for *certiorari*." The United States Supreme Court denied defendant's petition for a writ of *certiorari* on March 17, 1997. *Emerson v. Gilmore*, 520 U.S. 1122, 137 L. Ed. 2d 339, 117 S. Ct. 1260 (1997).

At a June 26, 1997, status conference, counsel for de-

fendant informed the circuit court of the time limit provided in the federal district court's order. Defense counsel indicated his agreement to begin the sentencing proceedings on July 14, 1997, the day before the expiration of the 120-day period. The circuit court, therefore, set the case for sentencing on July 14 "[b]y agreement." On July 14, the jury for the sentencing proceedings was selected. Testimony in the eligibility phase began the next day. On July 16, the jury found defendant eligible for the death penalty. The jury returned its verdict in the aggravation-mitigation phase on July 18, 1997. The circuit court's judgment and execution order was dated August 19, 1997.

According to defendant, the 120-day time limit set by the federal courts expired on July 15, 1997, and the circuit court did not have jurisdiction to sentence him after this date. Defendant concludes that, because he was sentenced on August 19, 1997, his sentence is null and void. He, therefore, asks us to vacate his death sentence and remand the cause for imposition of a sentence other than death. The State responds that defendant's sentence is valid because the sentencing proceedings commenced within the 120-day period. Alternatively, the State asks us to reject defendant's argument because, *inter alia*, (1) defense counsel agreed to a continuance until July 14, and (2) certain delays in the sentencing proceedings were attributable to defendant.

We find that defendant's restrictive interpretation of the federal district court order is unwarranted. Counsel for both sides, as well as the circuit court, were aware of the 120-day time limit contained in the federal district court order. Given the nature of capital sentencing proceedings, their agreement to begin the sentencing proceedings on July 14, 1997, indicates that the court and the attorneys, including defense counsel, believed that the federal district court's order required commence-

ment, but not completion, of the sentencing proceedings within the 120-day period. We conclude that this is the reasonable interpretation of the federal district court order. See also *Cave v. Singletary*, 84 F.3d 1350 (11th Cir. 1996) (holding that state-court sentencing proceedings were timely when, during the 90-day period mandated by the federal court order, a status conference was held at which the parties agreed on a later sentencing date).

Defendant provides us with no authority to support his claim that the federal district court order required the sentencing proceedings to be *completed* by the expiration of the 120-day period. He relies on cases in which federal courts have found that a state court failed to comply with the time limit contained in a federal court order disposing of a defendant's petition for writ of *habeas corpus*. In these cases, however, the state courts failed to even commence, much less complete, the necessary proceedings within the time period required by the federal court orders. See *Latzer v. Abrams*, 615 F. Supp. 1226 (E.D.N.Y. 1985) (during the 60-day period within which the federal court required the defendant to be retried pursuant to his petition for a writ of *habeas corpus*, the state court arraigned the defendant but failed to begin his trial); *Homan v. Sigler*, 283 F. Supp. 404 (D. Neb. 1968) (the state court never conducted the evidentiary hearing that the federal court required it to hold within 90 days of its order disposing of the defendant's petition for a writ of *habeas corpus*). Thus, these decisions fail to support defendant's claim that initiation of resentencing proceedings within the time period ordered by a federal court is insufficient to comply with an order such as the one in this case.

In any event, even assuming that the circuit court failed to comply with the time limit contained in the federal district court order, we would reject defendant's challenge to his sentence. Even if a state court fails to

conduct new sentencing proceedings within the time period ordered by the federal court pursuant to a defendant's petition for a writ of *habeas corpus*, the state court may nevertheless resentence the defendant. See *Smith v. Lucas*, 16 F.3d 638 (5th Cir. 1994); *Moore v. Zant*, 972 F.2d 318 (11th Cir. 1992); see also *Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993) (if the state fails to retry a defendant within the time ordered by the federal court, the state may usually nevertheless rearrest and retry the defendant). Thus, even if untimely, the circuit court's sentencing order in this case is valid.

## B. *Voir Dire*

Next, we address defendant's argument that his sentence must be vacated and his cause remanded for a new sentencing hearing because of certain errors that occurred during *voir dire*. According to defendant, the circuit court erred in "death-qualifying" prospective jurors and in excusing venireperson Sandra Hersil for cause based on her views about the death penalty.

### 1. Death Qualification of the Jury

During *voir dire*, the circuit court asked prospective jurors whether their feelings about the death penalty were such that "no matter what the facts of the case may be and no matter what the background of the Defendant may be, that under no circumstances would you ever give the death penalty in a murder case." The court excluded for cause those venirepersons who indicated that their feelings about the death penalty would prevent them from imposing it under any circumstances.

According to defendant, the exclusion of these venirepersons violated his federal and state constitutional rights because it resulted in a jury that was more punitive and more likely to impose the death penalty and denied him his right to be tried by an impartial jury drawn from a fair cross-section of the community. See

U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 2, 8.

In other cases, the United States Supreme Court has already rejected the federal constitutional challenges defendant makes to the death-qualification procedure. The Court has stated that the State has a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." *Wainwright v. Witt*, 469 U.S. 412, 416, 83 L. Ed. 2d 841, 846-47, 105 S. Ct. 844, 848 (1985). Thus, a juror may be excluded for cause based on his or her views on the death penalty if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52, 105 S. Ct. at 852, quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980). Under this standard, the Court has held that a juror who "in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan v. Illinois*, 504 U.S. 719, 728, 119 L. Ed. 2d 492, 502, 112 S. Ct. 2222, 2229 (1992).

Defendant argues that this court should nevertheless find that the death qualification of the jury in this case violated his rights to due process and an impartial jury under the Illinois Constitution. See Ill. Const. 1970, art. I, §§ 2, 8. As defendant argues, this court may interpret provisions of the Illinois Constitution more broadly than analogous federal constitutional provisions. See *People v. Krueger*, 175 Ill. 2d 60, 74 (1996). In determining the extent of state constitutional protections, federal decisions interpreting similar federal constitutional provisions are persuasive but not controlling. *People v. McCauley*, 163 Ill. 2d 414, 436 (1994).

Defendant fails to offer a convincing reason why, in the context of death qualification, this court's interpretation of state constitutional rights to due process and an impartial jury should differ from the Supreme Court's interpretation of their federal constitutional counterparts. He provides us with no basis for concluding that the framers of the Illinois Constitution intended it to be interpreted differently than the federal constitution with respect to death qualification of jurors. See *People v. DiGuida*, 152 Ill. 2d 104, 118 (1992) ("[W]here the language of the State constitution, or where debates and committee reports of the constitutional convention show that the Framers intended a different construction, [this court] will construe similar provisions in a different way from that of the Supreme Court"). Moreover, in the past, this court has indicated agreement with the Supreme Court's decisions finding that death qualification of a jury does not violate a defendant's federal constitutional rights to due process and an impartial jury. See, *e.g.*, *People v. Silagy*, 101 Ill. 2d 147, 165 (1984); *People v. Free*, 94 Ill. 2d 378, 401-02 (1983).

In addition, in an analogous case involving death qualification of a jury, this court has already rejected the argument that the state due process clause provides greater protections for defendants than the federal due process clause. In *People v. Coleman*, 168 Ill. 2d 509 (1995), this court held that, where the same jury that determines a defendant's guilt also decides whether to impose the death penalty, death qualification of the jury does not violate the due process provision of the Illinois Constitution. After noting that the United States Supreme Court had held that death qualification of a jury under these circumstances does not violate federal due process (see *Lockhart v. McCree*, 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986)), the *Coleman* court rejected the defendant's argument that death qualifica-

tion nevertheless violates Illinois constitutional due process protections. *Coleman*, 168 Ill. 2d at 549-50, citing *People v. Sanchez*, 115 Ill. 2d 238, 266 (1986) ("defendant has not presented, nor do we perceive independently, any State constitutional basis for departing from our prior cases and the now-consistent Supreme Court position on the issue").

In arguing that this court should find that the death-qualification process violates the Illinois Constitution, defendant relies entirely on three "empirical studies on the effect of death qualification." See C. Haney, *"Modern" Death Qualification: New Data on its Biasing Effects*, 18 Law & Hum. Behav. 619, 629 (1994); R. Fitzgerald & P. Ellsworth, *Due Process vs. Crime Control: Death Qualification and Jury Attitudes*, 8 Law & Hum. Behav. 31, 46 (1984); E. Bronson, *Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California*, 3 Woodrow Wilson L.J. 11, 25-31 (1981). He asserts that these studies "conclusively demonstrate that death qualification disproportionately excludes African-Americans, women, Democrats, younger people, low income people, the least and the best educated, unskilled workers, Jews, and agnostics."

Both this court and the United States Supreme Court have rejected such studies as a basis for finding that death qualification of a jury denies a defendant his right to an impartial jury drawn from a fair cross-section of the community. See *Lockhart*, 476 U.S. at 168-79, 90 L. Ed. 2d at 144-51, 106 S. Ct. at 1762-68; *People v. Kubat*, 114 Ill. 2d 424, 439-40 (1986). In this case, we also decline to base a finding that death qualification violates our state constitution on three social science studies. We hold that it was proper for the circuit court in this case to death qualify the jury.

## 2. Exclusion of Venireperson Sandra Hersil

Defendant contends, however, that, even if we uphold the death-qualification procedure used in this case, his sentence must be vacated and his cause remanded for a new sentencing hearing because the circuit court erred in excluding prospective juror Sandra Hersil for cause based on her opposition to the death penalty.

During *voir dire*, when venireperson Sandra Hersil was asked about her views on the death penalty, she stated:

"Well, I believe what the Lord has told us that an eye is for an eye and a tooth is for a tooth, but I don't think in reality I could judge and put a person to death. And live myself without—I don't know if I would have psychological, emotional or what kind of trauma. I would have trauma."

The circuit court then asked Hersil whether she would refuse to vote for the death penalty, regardless of the facts of the case. Hersil replied:

"I think I could probably say in reality, if my child was involved or my grandchild I would definitely say I would believe I would vote for death. But I don't know if I could do it for other people. I guess that's a maternal instinct in me."

The circuit court asked Hersil if she meant that, in this case, she would not be able to vote for the death penalty, no matter what the facts were. Hersil stated: "Probably the only time I could do it [is] if it involved a small child." At the request of counsel for both sides, the circuit court informed Hersil that, under Illinois law, a person could be eligible for the death penalty in certain circumstances and asked Hersil whether she could follow the law and vote for the death penalty if that were appropriate. Hersil responded: "I think I probably would. I don't know that I could vote for it."

According to defendant, it was error to exclude Hersil for cause because, although she indicated that imposing the death penalty might cause her psychological or

emotional trauma, she indicated a "clear willingness to set aside her personal feelings and follow the law."

A prospective juror may not be removed for cause merely because he or she expresses general objections or conscientious or religious scruples against the imposition of the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1776-77 (1968); *People v. Shaw*, 186 Ill. 2d 301, 316 (1998). For a venireperson's views on the death penalty to justify excusing that person for cause, they must " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52, 105 S. Ct. at 852, quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980); *People v. Seuffer*, 144 Ill. 2d 482, 505 (1991). Removal of a venireperson for cause is appropriate unless it is clear that the venireperson is willing to set aside his or her own beliefs in favor of the rule of law. *Lockhart*, 476 U.S. at 176, 90 L. Ed. 2d at 149-50, 106 S. Ct. at 1766; *People v. Taylor*, 166 Ill. 2d 414, 423-24 (1995); *People v. Pitsonbarger*, 142 Ill. 2d 353, 386 (1990).

In determining whether a venireperson should be excused for cause, the venireperson's remarks must be considered as a whole. *People v. Gilliam*, 172 Ill. 2d 484, 511 (1996). "A trial judge need not follow a set formula in posing questions on *voir dire*, and it may be appropriate to exclude a prospective juror even though the person has not expressed his or her views with meticulous precision." *People v. Cole*, 172 Ill. 2d 85, 99 (1996). The circuit court's determination as to whether a prospective juror should be excused for cause will be upheld absent an abuse of discretion. *People v. Terrell*, 185 Ill. 2d 467, 489 (1998).

We find that, viewed in their entirety, Hersil's *voir dire* responses support the circuit court's determination

that her views on the death penalty would have " 'prevent[ed] or substantially impair[ed] the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath' " (see *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52, 105 S. Ct. at 852, quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980)). While Hersil indicated that she believed she could vote in favor of imposing the death penalty if a relative or small child were the victim, she stated that, in other cases, she did not think she could impose the death penalty or did not know if she could. Her responses do not, as defendant claims, indicate a "clear willingness" to follow the law despite her personal feelings about the imposition of the death penalty. When specifically asked whether she could follow the law by imposing the death penalty in an appropriate case, Hersil initially responded that she "probably" would, but then stated that she did not know whether she could. It was not clear from these responses that Hersil would have been able to set aside her personal beliefs and follow the law. See *Lockhart*, 476 U.S. at 176, 90 L. Ed. 2d at 149-50, 106 S. Ct. at 1766; *Taylor*, 166 Ill. 2d at 423.

In other cases involving *voir dire* responses similar to Hersil's, this court has held that the circuit court properly excused the prospective jurors for cause. For example, in *People v. Cole*, 172 Ill. 2d 85, 100 (1996), the prospective juror initially stated that she did not really believe in the death penalty and did not know whether she could vote to impose it. The prospective juror then asserted that she would be able to follow the law and vote to impose the death penalty in an appropriate case but subsequently stated that she did not think she would be able to sign a verdict in favor of the death penalty. This court concluded that, when the prospective juror's remarks were viewed as a whole, the circuit court did not abuse its discretion in excusing her for cause. *Cole*, 172 Ill. 2d at 100; see also *Taylor*, 166 Ill. 2d at 424.

As in *Cole*, Hersil's responses to questioning about her ability to follow the law were equivocal and indicated that she would not be able to vote in favor of the death penalty. The circuit court was in a superior position to evaluate the meaning of Hersil's responses (see *People v. Hickey*, 178 Ill. 2d 256, 295-96 (1997)), and we cannot conclude based on the record that it abused its discretion in excusing her for cause. We find no error in the *voir dire* of prospective jurors for defendant's sentencing hearing.

## II. Eligibility

Defendant challenges the jury's eligibility verdict on several bases. He contends that his death sentence must be reversed and his cause remanded for imposition of a sentence other than death because there was insufficient evidence to support the jury's finding of eligibility. In the alternative, defendant argues that he must receive a new sentencing hearing because of the following errors at the eligibility stage of sentencing: (1) the circuit court admitted hearsay testimony by Stevenson concerning a prior consistent statement by Ray; (2) the circuit court permitted four photographs of Byrd's body to be published to the jury; (3) the circuit court made comments indicating its opinion that defendant was eligible for the death penalty; (4) the prosecution made improper remarks during its closing argument; and (5) the circuit court failed to respond to a question the jury posed during its deliberations.

### A. *Sufficiency of the Evidence*

Defendant argues that his death sentence cannot stand because the evidence was insufficient to support the jury's finding of eligibility. In reviewing the sufficiency of the evidence at eligibility, the standard is "whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found the elements necessary to establish defendant's eligibility for the death penalty beyond a reasonable doubt." *People v. West*, 187 Ill. 2d 418, 436 (1999), citing *People v. Pasch*, 152 Ill. 2d 133, 213-14 (1992). Under this standard, "determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact." *People v. Nitz*, 143 Ill. 2d 82, 95 (1991).

In this case, the State relied exclusively on the felony-murder aggravating factor to establish defendant's eligibility for the death penalty. See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6). The State sought to prove defendant's eligibility by showing that defendant killed Delinda Byrd during the course of an armed robbery. Thus, to return a verdict of eligibility for the death penalty, the jury was required to find (1) defendant was 18 years or older; (2) defendant was found guilty of murder; (3) Byrd was actually killed by defendant; (4) defendant killed Byrd "intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another"; and (5) Byrd was killed during the course of an armed robbery. See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).

Defendant challenges only the jury's finding that he actually killed Delinda Byrd. He argues that the evidence was insufficient to support a conclusion by the jury that he, rather than Jackson, stabbed Byrd or set the fire in the bedroom. With respect to Byrd's stab wounds, defendant notes that there was no physical or scientific evidence that showed that he stabbed Byrd. In addition, defendant asserts that Ray's testimony did not support a conclusion that defendant stabbed Byrd because Ray admitted that he looked away before she was stabbed. According to defendant, the evidence that Jackson sug-

gested the scissors as a weapon by saying, "use this," indicates that he, rather than defendant, actually stabbed Byrd. As for the fire, defendant argues that Ray testified that he did not know who started the fire and that both defendant and Jackson were in the bedroom before Ray noticed it was on fire. Defendant concludes that, based on this evidence, no reasonable jury could have found beyond a reasonable doubt that he actually killed Byrd.

After reviewing the evidence in this case in the light most favorable to the prosecution, we cannot agree with defendant that there was an insufficient basis for the jury's determination that he actually killed Byrd. First, we find that the evidence was sufficient to support a conclusion by the jury that defendant inflicted Byrd's stab wounds, which Donoghue testified were the immediate cause of her death. While there was no physical evidence connecting defendant to Byrd's stabbing, Ray's testimony was sufficient to support a conclusion that defendant stabbed her.

Ray's testimony indicated that it was defendant, not Jackson, who took the active role in the offenses against Ray and Byrd. Defendant was the one who called Ray to arrange the visit on the night of the murder. Defendant was the one who announced the armed robbery and first pointed a gun at Ray and Byrd. He was also the one who tied Ray and Byrd with electrical cord, emptied the cash register, removed items from the apartment, and stabbed Ray. During the robbery and stabbings, Jackson merely sat nearby and pointed a gun at Ray and Byrd.

Ray's testimony about the details of Byrd's stabbing also indicated that defendant himself inflicted her stab wounds. Ray testified that, immediately after defendant stood over him and stabbed him with a half pair of scissors, defendant straddled Byrd in such a way that Ray concluded that defendant was about to "do the same thing to her." When Ray begged defendant not to stab

Byrd, defendant gave him an "evil" look. While Ray did not actually see defendant place the scissors into Byrd's back, Ray saw the hand in which defendant held the scissors move in a downward motion toward Byrd before Ray turned away. Donoghue testified that all of Byrd's wounds could have been made by the same instrument and that this instrument could have been a pair of scissors. It was reasonable to infer, based on this testimony, that defendant stabbed Byrd. See *People v. Buss*, 187 Ill. 2d 144, 211 (1999) (circumstantial evidence is sufficient to support a verdict of guilty where it satisfies the proof beyond a reasonable doubt standard).

By contrast, defendant's theory that Jackson stabbed Byrd is not reasonable based on the evidence. Defendant's suggestion that, just as Ray turned away, defendant stopped the downward motion of his hand and gave the scissors to Jackson to actually stab Byrd defies common sense and logic. The fact that defendant had just stabbed Ray and appeared to be preparing to stab Byrd in the same manner strongly supports a conclusion that defendant, not his brother, stabbed Byrd. Moreover, Jackson's direction to defendant to "use this" does not indicate that Jackson stabbed Byrd. To the contrary, the fact that Jackson suggested a weapon for defendant to use rather than using it himself to stab Ray indicates that defendant stabbed Byrd.

The evidence was also sufficient to support a determination by the jury that defendant set the fire, which resulted in the burns that were a contributing cause of Byrd's death. Ray testified that, after defendant stabbed him, defendant went into Ray's bedroom for a few minutes. When defendant exited the room, defendant and Jackson carried Ray into this bedroom, which was now on fire. A reasonable inference from this description of events is that defendant set the fire in the bedroom. Contrary to defendant's assertion, Ray did not testify

that Jackson accompanied defendant into the bedroom before helping defendant throw Ray and Byrd into the room. Instead, Ray testified that he did not recall whether Jackson went into the bedroom with defendant. Ray's testimony that the bedroom was on fire after defendant entered it for a few minutes, as well as his testimony describing defendant's primary role in the robbery and stabbings, permitted a reasonable inference by the jury that defendant, rather than Jackson, set the fire in the bedroom. Accordingly, we hold that, viewing the evidence in the light most favorable to the prosecution (*Pasch*, 152 Ill. 2d at 213-14), a reasonable jury could have found beyond a reasonable doubt that defendant killed Byrd and was eligible for the death penalty under section 9—1(b)(6).

Alternatively, defendant argues, he is entitled to a new sentencing hearing because the jury's verdict finding him eligible for the death penalty was contrary to the manifest weight of the evidence. Given defendant's failure to cite any authority supporting the application of a manifest weight of the evidence standard to this court's review of an eligibility verdict, we decline to apply this standard. See 177 Ill. 2d R. 341(e)(7); *People v. Madej*, 177 Ill. 2d 116, 162 (1997) (failure to cite relevant authority results in waiver of the argument); see also *Shaw*, 186 Ill. 2d at 342-44 (under the Illinois capital sentencing scheme, a defendant has a liberty interest in having a jury decide his or her eligibility for death and whether any mitigating factor or factors should preclude capital punishment and a court may not make these determinations when a defendant has elected a jury).

B. *Admission of Officer Stevenson's Testimony*

In addition to challenging the evidentiary support for the jury's eligibility verdict, defendant asserts that several errors that occurred at the first stage of sentencing require that he receive a new sentencing hearing. Among

these errors is the admission of Officer Stevenson's testimony that Ray had identified defendant and Jackson as the men who had robbed and stabbed him. Specifically, defendant asserts that he was denied a fair sentencing hearing by Stevenson's testimony that, during the conversation he and his partner had with Ray outside the burning lounge, Ray said, "[T]wo guys had came in and robbed him, had stabbed him and set the lounge on fire." Stevenson further testified that Ray said that the two men were "Dennis" and his brother. According to defendant, this testimony was inadmissible hearsay, and its admission permitted the State to improperly bolster Ray's credibility. Defendant asserts that the erroneous admission of this testimony was unduly prejudicial in light of the fact that the State's theory of eligibility was entirely dependent on Ray's testimony. Defendant admits that there was no objection at trial to Officer Stevenson's testimony but urges us to review the issue under the plain error doctrine.

The State responds that the defendant waived this issue and that the plain error doctrine does not apply. Further, the State argues that Officer Stevenson's testimony was not inadmissible hearsay. According to the State, the testimony was properly admitted to show why Officer Stevenson and his partner went to look for defendant and his brother after talking to Ray. Alternatively, the State contends that the testimony was properly admitted under the excited-utterance exception to the hearsay rule. Finally, the State asserts that any error was harmless because defendant's identity as one of the perpetrators was not an issue at eligibility.

The plain error doctrine permits a court to consider an error not properly preserved at trial where the evidence is closely balanced or the alleged error was so substantial as to deny the defendant a fair proceeding. *People v. Brown*, 185 Ill. 2d 229, 254-55 (1998). Neither

of these circumstances applies to defendant's claim. The evidence at defendant's eligibility hearing was not closely balanced.

In addition, we find that the circuit court properly admitted Stevenson's testimony about Ray's identification of defendant. The rules governing the admission of evidence at trial also apply at the eligibility stage of capital sentencing. See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e) (now 720 ILCS 5/9—1(e) (West 1996)). Generally, a witness may not testify concerning an out-of-court statement by the witness or a third person when that out-of-court statement corroborates the declarant's testimony at trial. *People v. Beals*, 162 Ill. 2d 497, 507 (1994). When the statement is one of identification, however, this general rule does not apply. *Beals*, 162 Ill. 2d at 507-08. Instead, section 115—12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—12 (West 1996)) provides a statutory exception to the hearsay rule for such testimony. According to this provision:

"A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115—12 (West 1996).

"Under section 115—12, a witness' prior statement of identification is admissible as substantive evidence in a criminal trial when testified to by the witness or by a third person, such as a police officer, who was present when the witness made the identification." *People v. Hayes*, 139 Ill. 2d 89, 140 (1990).

Officer Stevenson's testimony falls squarely within this statutory exception. The declarant, Ray, testified at the eligibility hearing, and the defense had an opportunity to cross-examine him about his statement to police identifying defendant and Jackson as the individuals who had just stabbed and robbed him. See *Beals*, 162

Ill. 2d at 507-08; *People v. Tayborn*, 254 Ill. App. 3d 381, 390 (1993).

In arguing that the admission of Officer Stevenson's testimony requires that he receive a new sentencing hearing, defendant notes that the admission of similar testimony was one of the bases for this court's decision in *Emerson I* that he receive a new trial. See *Emerson I*, 97 Ill. 2d at 499-502. We observe, however, that *Emerson I* was decided in 1983, prior to the enactment of section 115—12 in 1984. Under this statute, Officer Stevenson's testimony was properly admitted at defendant's sentencing hearing. Accordingly, we find no plain error.

### C. *Admission of Photographs*

Defendant also contends that the admission of photographs of Byrd's body require that he receive a new sentencing hearing because these photographs were not relevant to eligibility and were unduly prejudicial. During the eligibility phase of sentencing, defendant objected to the admission of seven morgue photographs of Byrd on the basis that they were irrelevant and inflammatory. The circuit court admitted all of the photographs into evidence, but ordered that only four of these photographs be published to the jury. In all four photographs, Byrd's skin is burned and peeling. One of these photographs shows Byrd's face, shoulders, and hands. Another shows her entire body, but her clothing covers all but her face, neck, hands, and one arm. The third photograph shows the front of her torso. Her shirt is opened, revealing several stab wounds on her chest. Several stab wounds to her back are also visible in the fourth photograph, which depicts the back of Byrd's torso without her clothing. During their testimony, Donoghue and Barry described these photographs.

"The purpose of the first stage of a capital sentencing hearing is to allow the jury to determine a defendant's eligibility for the death penalty free from any potentially

inflammatory evidence that could improperly influence this decision." *Terrell*, 185 Ill. 2d at 490. Thus, only evidence that directly relates to the statutory prerequisites for eligibility should be admitted at the first stage of a capital sentencing hearing. *People v. Edgeston*, 157 Ill. 2d 201, 224 (1993). The circuit court's decision to admit photographs into evidence at the eligibility stage will not be overturned absent an abuse of discretion. *People v. Simms*, 143 Ill. 2d 154, 175 (1991).

In this case, the State relied on section 9—1(b)(6) to establish defendant's eligibility for the death penalty. Pursuant to this provision, the State was required to show, *inter alia*, that defendant actually killed Byrd and that he did so "intentionally or with the knowledge that the acts which caused [her] death created a strong probability of death or great bodily harm to [Byrd] or another." See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).

The photographs were relevant to both of these statutory prerequisites. They assisted the jury in determining whether defendant actually killed Byrd. They helped the jury to understand and evaluate Donoghue's testimony concerning the cause of her death, as well as Ray's testimony concerning the manner of her death. By showing the nature, location, and extent of Byrd's injuries, the photographs were also probative of defendant's intent to kill her and his knowledge that his acts created a strong probability of death or great bodily harm. See *Terrell*, 185 Ill. 2d at 495 (photographs of a decedent are admissible at the eligibility stage to show the nature and extent of the injuries, to show the manner and cause of death, and to help the jury understand the testimony of a witness).

Defendant claims that the photographs were not relevant to the statutory requirements of section 9—1(b)(6) because they showed Byrd's burns. He asserts that her death was caused by her stab wounds, and there was no

evidence that he started the fire. We disagree. The photographs do not show only Byrd's burns. Her stab wounds, which defendant concedes caused her death, are visible in two of the four photographs. In addition, contrary to defendant's assertion, evidence of Byrd's burns was not irrelevant to the issues at the eligibility hearing. Ray's testimony permitted a reasonable inference that defendant started the fire in the bedroom, and Donoghue testified that the burns Byrd sustained in this fire were a contributing cause of her death. Accordingly, photographs of her burns were probative of whether defendant actually killed Byrd and whether he intended to do so.

Defendant further argues that, even if probative of the statutory prerequisites at eligibility, the photographs should have been excluded because their prejudicial effect outweighed their probative value. Although photographs that are introduced solely to inflame the jury are not admissible (*People v. Rissley*, 165 Ill. 2d 364, 405 (1995)), photographs of a deceased victim which are probative of an issue at eligibility are admissible, even if gruesome or inflammatory (*Simms*, 143 Ill. 2d at 177).

In this case, we find that the photographs of Byrd's body were not admitted solely to inflame the jury and that their probative value outweighed their prejudicial effect. Only four photographs of Byrd's injuries were published to the jury, and each helped to show the nature, location, and extent of her injuries. Two were necessary to show the location of her stab wounds, and all four demonstrated that serious burns covered most of her body. We hold that the circuit court did not abuse its discretion in admitting this evidence at eligibility. See *Terrell*, 185 Ill. 2d at 496 (autopsy photographs of a 15-month-old victim were properly admitted to show a defendant's eligibility under section 9—1(b)(6)); *Simms*, 143 Ill. 2d at 175 (several photographs of the victim's stab wounds and bloodstains in the victim's apartment

were admissible to show the defendant's eligibility under section 9—1(b)(6)); *People v. Rogers*, 123 Ill. 2d 487, 517-18 (1988) (photographs of the victim's stab wounds were admissible to show the defendant's eligibility under section 9—1(b)(6)).

### D. *Comments by the Court*

Defendant next argues that comments by the circuit court regarding the expected length of the sentencing hearing deprived him of a fair hearing on eligibility by suggesting that the court believed defendant would be found eligible for the death penalty. For example, during *voir dire*, the circuit court made the following statements to a panel of prospective jurors:

"And finally, is there anyone who would be seriously inconvenienced, and I stress the word seriously inconvenienced by serving on this jury?

We have spoken with the attorneys, everybody anticipates that this case will be over next Monday. There is a chance it will be over Friday. There is a chance it may go to Tuesday, but everybody anticipates it should be over Monday.

If there is anybody seriously inconvenienced, please raise your hand."

In addition, on the first day of the eligibility hearing, the circuit court apologized for keeping the jurors late the previous night, but told them: "Had we not picked the jury yesterday, we would still be in the jury selection process today which means that we would delay everything one additional day and so while you probably weren't too happy last night you probably will be happier Friday or Monday or whenever we're done with the case that we don't have to come back an extra day." At the end of the day, the circuit court informed the jurors, "I've been speaking with the attorneys and we do anticipate that we should be able to finish the case by Monday."

According to defendant, these comments were improper because they suggested to jurors that the court

assumed defendant would be found eligible for the death penalty and that an aggravation-mitigation hearing would be necessary. Further, defendant asserts that the circuit court's comments indicated the defendant's own attorneys shared this assumption. He claims that the prejudice from these remarks is demonstrated by the short time the jury spent deliberating the eligibility question. Thus, defendant contends that a new sentencing hearing is required.

The State responds that defendant waived this issue for review by failing to object to the circuit court's comments at trial. The State also challenges defendant's argument on the merits. According to the State, the circuit court's comments were innocuous and "routine housekeeping."

As defendant argues, this court has relaxed the waiver rule when the asserted error involves the conduct of the circuit court. See *Kliner*, 185 Ill. 2d at 161; *People v. Nevitt*, 135 Ill. 2d 423, 455 (1990); *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963). We will, therefore, address the merits of defendant's argument despite his failure to object to the circuit court's comments at trial.

The circuit court is charged with the responsibility of ensuring that all defendants receive a fair trial. *People v. Burrows*, 148 Ill. 2d 196, 250 (1992). Because of its great influence on jurors, the circuit court must "exercise restraint over [its] utterances and refrain from unnecessary disparagement of issues." *Terrell*, 185 Ill. 2d at 487. Comments by the circuit court will not, however, amount to reversible error unless they are material or had a probable effect on the jury's verdict. *People v. Brown*, 172 Ill. 2d 1, 38-39 (1996).

In an analogous case, *People v. Shum*, 117 Ill. 2d 317 (1987), this court held that the circuit court's remarks about the expected length of the trial were proper. In *Shum*, during *voir dire*, the circuit court provided pro-

spective jurors with an estimate of the length of the defendant's trial. During the trial, the circuit court also told the jury when it could expect to be sequestered. The defendant argued that these comments denied him a fair trial. We found no error based on the circuit court's statements regarding the length of the trial. Instead, we found that the court's statements permitted prospective jurors to determine whether they would be able to serve on the jury during the entire trial. This was an appropriate exercise of the court's responsibility for informing prospective jurors of the scope of their duty. *Shum*, 117 Ill. 2d at 345-46. Similarly, the circuit court's remark about when the jury could expect to be sequestered was proper because it was consistent with the circuit court's responsibility for organizing the court and its consideration for the jury. *Shum*, 117 Ill. 2d at 346.

As in *Shum*, we find no error in the circuit court's comments regarding the estimated length of the sentencing hearing in this case. It was appropriate for the circuit court to provide prospective jurors with an estimate of the length of defendant's sentencing hearing in order to determine their ability to serve on the jury throughout the sentencing hearing. With respect to the circuit court's comments during the hearing, we find that they were proper in light of the circuit court's administrative responsibilities at the sentencing hearing. See *Shum*, 117 Ill. 2d at 346; see also *People v. Eyler*, 133 Ill. 2d 173, 205-06 (1989) (circuit court's comments did not indicate to the jury that it assumed the defendant would be found guilty).

Moreover, during *voir dire* and at the conclusion of the eligibility hearing, the circuit court instructed jurors that, if they did not unanimously find defendant eligible for the death penalty, the second phase of the sentencing hearing would not take place. In addition, before the jury began its deliberations with respect to eligibility, the

circuit court stated: "Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." We cannot conclude that the circuit court's estimate of the length of the sentencing hearing had any effect on the eligibility verdict. Accordingly, we decline to grant defendant a new sentencing hearing on this basis.

### E. *Closing Argument*

In addition to asserting that improper comments by the circuit court denied him a fair hearing at the eligibility stage of sentencing, defendant contends that statements made by the prosecution at this stage constitute reversible error. First, defendant claims he was denied a fair sentencing hearing by the prosecution's reference to evidence not relevant to his eligibility for the death penalty. During its rebuttal argument, the prosecution stated: "You are not going to be able to find out what he is like, Dennis Emerson, until we get—until you sign a verdict form for eligibility." According to defendant, this comment invited the jury to speculate as to what he "is like," and his character or bad acts were not relevant at eligibility. Defendant asserts that identical comments by the prosecution caused this court to grant him a new trial in *Emerson I.*

As defendant argues, the prosecution's argument at eligibility must be limited to the narrow issue at that stage: whether the defendant is eligible for the death penalty. See *People v. Williams,* 161 Ill. 2d 1, 60-61 (1994). Argument relating to other matters, such as whether the defendant *should* receive the death penalty, is improper. *Williams,* 161 Ill. 2d at 60-61.

The State does not dispute that the prosecution's statement about what defendant "is like" was improper. Instead, the State asserts that any prejudice resulting from this statement was cured by defendant's prompt

objection, the circuit court's sustaining of this objection, and the court's immediate instruction to the jury that "The only thing you are deciding ladies and gentlemen, is the eligible [*sic*] for the death penalty as I told you numerous times."

Prosecutors are given wide latitude in making closing arguments (*People v. Williams*, 181 Ill. 2d 297, 330 (1998)), and a reviewing court will not reverse a jury verdict based on improper remarks unless they result in substantial prejudice to the defendant (*People v. Armstrong*, 183 Ill. 2d 130, 145 (1998)). "As a general rule, reversal and remandment are unnecessary where the trial court has sustained a defense objection, thereby curing the potential for improper influence from the comment, especially where the jury is instructed that closing argument of the attorneys should not be considered as evidence in the case." *People v. Enis*, 163 Ill. 2d 367, 407 (1994). The circuit court is in the best position to determine whether improper comments by the prosecution during closing argument resulted in prejudice to a defendant (*People v. Macri*, 185 Ill. 2d 1, 51 (1998)), and a circuit court's determination with respect to the propriety of closing argument will not be reversed absent an abuse of discretion (*Armstrong*, 183 Ill. 2d at 145).

In this case, we find that the prosecutor's comment does not require that defendant receive a new sentencing hearing. Although the comment was improper, the circuit court sustained the defense objection and instructed the jury regarding the limited question before them at the eligibility stage. See, *e.g.*, *People v. Ruiz*, 132 Ill. 2d 1, 17 (1989) (closing argument did not deny the defendant a fair trial when circuit court sustained the defendant's objection to the argument and gave the jury an appropriate instruction). Defendant has failed to demonstrate that he suffered substantial prejudice as a result of the State's remark.

Furthermore, defendant's argument that this court reversed his conviction in *Emerson I* based on similar comments does not support his contention that a new sentencing hearing is required. In *Emerson I*, the circuit court had granted defendant's motion *in limine* to preclude the State from commenting on the fact that, when he was arrested, defendant was in possession of a loaded revolver. *Emerson I*, 97 Ill. 2d at 496. During closing argument at the end of defendant's trial, defense counsel argued that defendant did not offer resistance when he was arrested and did not behave like a guilty person. The prosecution responded: " '[W]e can't tell you everything he did after his arrest and he knows it. Maybe when this is over I will tell you what he did when he was arrested.' " *Emerson I*, 97 Ill. 2d at 496. This court held that the comment by the prosecution was error because it is improper to argue facts that are inadmissible. *Emerson I*, 97 Ill. 2d at 497. Based on the cumulative effect of this and several other errors, this court reversed defendant's conviction. *Emerson I*, 97 Ill. 2d at 502.

Like the prosecution's references to inadmissible evidence in *Emerson I*, the prosecution's comment regarding what defendant "is like" was improper. As stated, however, any error resulting from the prosecution's argument at defendant's sentencing hearing was cured when the circuit court sustained defendant's objection and instructed the jury that defendant's eligibility was the only issue before it. In *Emerson I*, by contrast, the error was not cured, and the prosecution's reference to inadmissible facts was one of several improper comments by the prosecution during its argument. Thus, whereas a new trial was required in *Emerson I*, a new sentencing hearing is not required in the present appeal.

Defendant also claims that he was denied a fair hearing at the eligibility phase by the prosecution's repeated misstatement of the evidence during its argument.

Defendant's assertion of error is based on the prosecution's argument that he set the fire at the Centaur Lounge. For example, the prosecution argued: "The reason a lot of this evidence is not there is because of Dennis Emerson. *** He set the fire. *** He burned the place and left no fingerprints. No evidence whatsoever. That is how we know the defendant's intent." According to defendant, this argument was improper because there was no evidence that he set the fire or that police had any difficulty obtaining physical evidence due to fire damage.

The State argues that defendant has waived this issue for review by failing to object to these comments at the eligibility hearing. Defendant urges us to nevertheless consider the issue as plain error.

Neither element of the plain error doctrine is satisfied with respect to this issue. See *Brown*, 185 Ill. 2d at 254-55. As stated, the evidence at eligibility was not closely balanced. In addition, remarks by the prosecution during closing argument are considered proper so long as they are based on facts in evidence and reasonable inferences therefrom. *Williams*, 181 Ill. 2d at 330. Contrary to defendant's assertion, there was evidence presented at the eligibility hearing that he set the fire in Ray's apartment. Ray testified that, after stabbing him and Byrd, defendant went into Ray's bedroom for a few minutes. After leaving the bedroom, defendant and Jackson threw Ray into the bedroom, which was, at that time, on fire. The prosecution's argument that defendant set the fire was legitimately based on inferences from the evidence in this case. Likewise, the prosecution's statement that evidence was unobtainable because of the fire was a reasonable inference based on evidence concerning the extensive fire damage to the apartment and lounge. Accordingly, we find no error based on the State's argument regarding defendant's role in setting the fire.

## F. *The Court's Response to the Jury's Question*

Defendant also claims prejudice from the circuit court's refusal to answer a question the jury presented to the court during its deliberations on eligibility. The jury asked: "Do we unconditionally accept the previous judgments of guilty for murder, attempted murder and two counts of armed robbery as fact when evaluating this case or can we apply reasonable doubt to the prior guilty verdicts?" The circuit court asked the State and defense counsel for their recommendations for answering this question. The State asked the court to respond: "[Y]ou have evidence before you that the defendant has been convicted of armed robbery, attempt murder and murder. You are to consider that evidence in the eligibility phase." Defense counsel recommended that the court respond: "You are required to deliberate solely based on the evidence you have heard in this case in accordance with my instructions." The circuit court decided to provide the jury with the following answer: "You have received the evidence and jury instructions. Please continue to deliberate." Neither party objected to the wording of the circuit court's response.

Now, defendant claims that the circuit court failed to respond to the jury's question and that this failure requires that he receive a new sentencing hearing. According to defendant, the circuit court was required to respond to the jury's question because it demonstrated the jury's confusion regarding the legal effect of his prior convictions. Defendant contends that, as a result of the circuit court's failure to respond to the jury's question, there is a "strong likelihood" that the jury failed to make its own determination at eligibility as to whether defendant had actually killed Byrd because it assumed that this issue had already been determined at trial.

We agree with the State that defendant has waived this issue for review. "Where a defendant acquiesces in the circuit court's answer to the jury's question, the de-

fendant cannot later complain that the circuit court abused its discretion." *People v. Reid*, 136 Ill. 2d 27, 38 (1990). In this case, we are unable to discern any significant difference between the answer suggested by defense counsel and the answer the circuit court provided to the jury. Accordingly, we find the issue waived.

### III. Aggravation-Mitigation

Having determined that defendant was properly found eligible for the death penalty under section 9—1(b)(6), we now turn to his arguments that the jury's verdict at the second stage of sentencing cannot stand. Defendant asserts that an examination of the evidence presented at the aggravation-mitigation stage, as well as sentences received by his codefendant and defendants in other cases, demonstrates that the death penalty is an excessive sentence in his case. Thus, he contends, this court must vacate his death sentence and remand his cause for imposition of a sentence other than death. Alternatively, defendant argues that he must receive a new sentencing hearing because the following errors, individually and cumulatively, denied him a fair hearing: (1) the circuit court excluded evidence of Jackson's sentence; (2) the circuit court prevented the jury from considering residual doubt; (3) the circuit court refused certain jury instructions proposed by the defense; (4) the circuit court permitted the State to make a rebuttal argument; and (5) the prosecution made improper comments in its closing argument.

### A. *Propriety of the Death Penalty in Defendant's Case*

#### 1. Aggravating and Mitigating Evidence

Defendant argues that his death sentence must be vacated because the evidence presented at the second stage of sentencing demonstrates that death is an excessive sentence in his case. With respect to the State's evidence in aggravation, defendant asserts that the evidence

indicates that, rather than a premeditated attack, the crimes were unplanned and the result of an isolated, explosive incident. In addition, defendant contends that his criminal record is 20 years old and that the acts that formed the basis for this record were not the acts of a calculating criminal. Defendant claims that, while the aggravating evidence was limited, weak, and remote, the evidence in mitigation was extensive, strong, and fresh. He argues that, despite his troubled childhood, his record in prison is "exemplary," and he has developed positive and enduring relationships through correspondence and his interaction with prison staff members. In light of this mitigating evidence, defendant contends that his death sentence should be reversed and his cause remanded for the imposition of a sentence other than death. Alternatively, defendant claims that the jury's decision at the second stage of sentencing is contrary to the manifest weight of the evidence and that he must, therefore, receive a new sentencing hearing.

In determining whether a sentence of death is appropriate, we must consider the character and record of the defendant. *People v. Ward*, 154 Ill. 2d 272, 340 (1992). "[E]ach capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty." *People v. Johnson*, 128 Ill. 2d 253, 280 (1989). The propriety of a death sentence in a particular case depends on a balance between aggravating and mitigating factors, and the existence of one or more mitigating factors does not require a sentence other than death. *People v. Johnson*, 149 Ill. 2d 118, 150 (1992). Our review of defendant's death sentence requires us to make a separate evaluation of the record. *Ward*, 154 Ill. 2d at 340-41. However, "the decision of a capital sentencing jury

will not be overturned lightly, particularly where that decision is amply supported by the record." *People v. Hooper*, 172 Ill. 2d 64, 77 (1996); see also *People v. Jones*, 156 Ill. 2d 225, 256 (1993). In this case, we find that the record amply supports the jury's conclusion that the aggravating factors outweighed the mitigating factors.

The evidence in aggravation included the brutal and senseless nature of defendant's murder of Byrd and attempted murder of Ray. There was no indication that either Byrd or Ray resisted defendant and his brother's robbery of Ray's lounge and apartment. In fact, defendant had tied them with electrical cord and made them lie facedown on the floor of the apartment while Jackson pointed a gun at them. While they were in this helpless position, defendant stabbed Ray twice in the chest, and, after ignoring Ray's pleas not to harm Byrd, also stabbed her. Apparently believing that these steps to subdue Ray and Byrd were insufficient, defendant lit a fire in Ray's bedroom and left Ray and Byrd to die in the burning room after securing the doorknob to prevent them from escaping the fire. Defendant suggests that these events were spontaneous, but the evidence that defendant waited until Ray closed the bar to visit, that defendant had a history of committing armed robberies of businesses at closing time, and that defendant brought a gun with him when he visited Ray indicates advance planning.

In addition, there was evidence that defendant's crimes against Ray and Byrd were the culmination of a criminal record that began when defendant was a juvenile. This record showed that, shortly after he was released from a juvenile correctional facility or prison, defendant would engage in criminal activity. Indeed, Byrd's murder occurred less than one month after defendant was released from prison for another offense. His crimes progressed from minor offenses as a juvenile to

violent offenses as a young adult. Defendant attempts to minimize the seriousness of these offenses, but we observe that his criminal record includes several armed robberies, and Byrd's murder illustrates the potential for violence associated with this type of crime.

In mitigation, defendant relies in part on his troubled childhood, low IQ, and learning disability. In other cases, however, we have held that a jury may find that evidence of a defendant's troubled childhood or developmental problems is not inherently mitigating and may be considered aggravating because it suggests future dangerousness. See *Madej*, 177 Ill. 2d at 140; *People v. Sanchez*, 169 Ill. 2d 472, 491-92 (1996).

The majority of defendant's mitigating evidence concerns his good behavior since his incarceration in 1980. We have previously found in other cases, however, that a defendant's good behavior in prison was insufficient to offset the aggravating evidence against the defendant. See *Madej*, 177 Ill. 2d at 140; *People v. Garcia*, 165 Ill. 2d 409, 437 (1995). While defendant's conduct in prison is commendable, we do not find that it outweighs the aggravating evidence in this case. There was evidence that, when defendant was incarcerated prior to the armed robberies he committed in the seventies and his crimes against Ray and Byrd, defendant's adjustment to imprisonment was positive and his behavior in correctional facilities was good. We cannot conclude, therefore, that defendant's most recent good behavior necessarily indicates a transformation in his character. See *People v. Turner*, 156 Ill. 2d 354, 361 (1993), quoting *Skipper v. South Carolina*, 476 U.S. 1, 14-15, 90 L. Ed. 2d 1, 13, 106 S. Ct. 1669, 1676 (1986) (Powell, J., concurring, joined by Burger, C.J., and Rehnquist, J.) (" '[O]ne arrested for a capital crime, and particularly a convicted defendant awaiting sentencing, has every incentive to behave flawlessly in prison if good behavior might cause

the sentencing authority to spare his life. Good behavior in those circumstances would rarely be predictive as to the conduct of the prisoner *after* sentence has been imposed' " (emphasis in original)).

In addition, there were significant conflicts in the evidence regarding defendant's character. For example, Miller testified that defendant had a learning disability, was borderline mentally retarded, and never functioned above a fourth-grade level. By contrast, defendant's wife testified that she and defendant had communications involving her interests in philosophy and mathematics, and other individuals with whom defendant corresponded described him as articulate, well-read, and above-average intelligence. Furthermore, the evidence that, after his incarceration, defendant was kind, considerate, polite, and responsible appears inconsistent with the evidence of his violent and extensive criminal record. Given these discrepancies, the jury at sentencing could have reasonably concluded that defendant's behavior in prison was not an accurate indication of his character. In light of the aggravating evidence and our review of the record, we cannot conclude that the death penalty was an excessive sentence in this case.

Having determined that there is ample support in the record for the jury's verdict at the aggravation-mitigation stage of sentencing, we decline to consider defendant's alternative argument that he must receive a new sentencing hearing because the jury's decision to impose the death penalty was against the manifest weight of the evidence. Defendant has failed to cite any authority for the application of this standard to our review of the jury's verdict at the second stage of sentencing. See 177 Ill. 2d R. 341(e)(7); *Madej*, 177 Ill. 2d at 162; see also *Shaw*, 186 Ill. 2d at 342-44.

### 2. Richard Jackson's Sentence and
### Sentences Imposed in Other Cases

In addition to arguing that his death sentence is excessive based on the evidence presented at the aggravation-mitigation stage of sentencing, defendant contends that a comparison of his sentence to sentences received by Richard Jackson and defendants in other cases demonstrates that the death penalty is inappropriate in defendant's case. Defendant claims that his death sentence is "grossly disproportionate" to Jackson's 60-year term of imprisonment. Defendant argues that Jackson's role in the offenses against Ray and Byrd was equal to, if not more culpable, than defendant's. Defendant asserts that Jackson "came up with the idea" of using the scissors to stab Ray and Byrd, held them at gunpoint, and helped throw them into the burning bedroom. In addition, defendant bases his disproportionality argument on Jackson's criminal record, which includes violent crimes, and Jackson's poor disciplinary record in prison. In light of this evidence of Jackson's conduct and his own good conduct in prison, defendant argues that his death sentence must be vacated and his cause remanded for a sentence other than death to be imposed.

While a disparity in the sentences of codefendants does not, in itself, show a violation of fundamental fairness, "[a]rbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible." *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). In reviewing the sentences of codefendants, this court considers the following factors: "the nature of the offense, each defendant's relative involvement or culpability, his character and background, including any criminal record, and his potential for rehabilitation." *Kliner*, 185 Ill. 2d at 175-76.

Under these factors, we find that defendant's death sentence is not unreasonably disparate. Defendant's and

Jackson's criminal backgrounds are comparable. Evidence in the record shows that, prior to his incarceration for the offenses against Ray and Byrd, Jackson was convicted of robbery and unlawful use of a weapon. While in prison in 1981, Jackson stabbed a prison guard and was convicted of aggravated battery and armed violence. Defendant has convictions for grand theft, robbery, and receiving and possessing money stolen from a federal bank. Also, like his brother, defendant has a criminal history involving violent offenses, such as armed robbery and unlawful use of a weapon to commit felonies.

Defendant correctly observes that his behavior in prison is better, by far, than his brother's. Whereas defendant has had essentially no disciplinary problems, Jackson's prison record from 1980 to 1984 shows that he had repeated disciplinary violations involving violence, including possession of a weapon, attacking prison staff members, and fighting.

While their behavior in prison suggests that defendant's potential for rehabilitation may be greater than that of his brother, this is only one factor we consider in determining whether a defendant's capital sentence is disproportionate to his codefendant's sentence. We must also consider the relative culpability of defendant and Jackson in the crimes against Ray and Byrd. We disagree with defendant's assertion that Jackson's role in these crimes was equal to or greater than his own. While we do not minimize Jackson's responsibility for these offenses, we believe that defendant was clearly the more culpable participant in these crimes. Defendant arranged to meet with Ray, defendant initiated the armed robbery by pointing a gun at Ray and Byrd, defendant tied Ray and Byrd with electrical cord, defendant removed items from the apartment, defendant stabbed Ray and Byrd, and defendant set the fire in the bedroom. Jackson assisted defendant in committing the crimes by holding Ray and Byrd

at gunpoint, suggesting a weapon for the stabbings, and helping to carry Ray and Byrd into the bedroom, but defendant performed the primary role in the crimes. Based on defendant's greater involvement and culpability in the crimes, we find his greater sentence was justified.

Defendant also argues that a comparison of his sentence to sentences received by defendants in other cases demonstrates that his sentence is excessive. Defendant claims that the circumstances surrounding his offense are much less egregious than those in other cases in which this court has upheld the imposition of the death penalty for murder during the course of an armed robbery. See *People v. Munson*, 171 Ill. 2d 158 (1996); *People v. Ashford*, 168 Ill. 2d 494 (1995). In support of his argument that the death penalty is excessive in his case, defendant also relies on other decisions in which this court has vacated the defendants' death sentences. See *People v. Smith*, 177 Ill. 2d 53 (1997); *People v. Buggs*, 112 Ill. 2d 284 (1986); *People v. Carlson*, 79 Ill. 2d 564 (1980).

Although comparative proportionality review is not required by the federal constitution or the Illinois death penalty statute, this court has nevertheless exercised its discretion to address comparative sentencing arguments by defendants in other capital cases. See, *e.g.*, *People v. Palmer*, 162 Ill. 2d 465, 491 (1994). In this case, we also choose to consider defendant's comparison of his sentence to sentences received by defendants in other capital cases.

A comparison of the facts of defendant's case to those in *People v. Munson*, 171 Ill. 2d 158 (1996), and *People v. Ashford*, 168 Ill. 2d 494 (1995), however, does not demonstrate that the death penalty was an excessive sentence in defendant's case. In those cases, as in defendant's, the death penalty was imposed for murders that occurred in the course of an armed robbery. In *Munson*, the defendant robbed the victim at gunpoint, kidnapped him,

fatally shot the victim because he was afraid the victim would identify him, and then set the victim's car on fire. *Munson*, 171 Ill. 2d at 167-73. In *Ashford*, the defendant fatally shot four individuals during an armed robbery because he did not want to leave any witnesses. *Ashford*, 168 Ill. 2d at 497-99. According to defendant, unlike *Munson* and *Ashford*, his case did not involve a planned, premeditated attack. Thus, defendant asserts, the death penalty is excessive in his case.

We cannot agree. There was evidence in the case at bar that defendant did indeed plan the armed robbery of the lounge. If the murders in *Munson* and *Ashford* were more horrific than those in defendant's case, such fact does not demonstrate that the facts of defendant's case are not, in themselves, sufficiently aggravating to warrant the imposition of the death penalty. As stated, defendant killed Byrd in a ruthless and brutal fashion. We find that defendant's comparison of his case to *Ashford* and *Munson* does not indicate that the death penalty was inappropriate in his case.

Defendant's comparison of his case to *Smith*, *Buggs*, and *Carlson* also does not demonstrate that his death sentence is excessive. Our decisions to vacate the defendants' death sentences in those cases were based on mitigating factors that are not present in defendant's case. See, *e.g.*, *Smith*, 177 Ill. 2d at 100-01 (the defendant had no criminal record, the murder was motivated by the defendant's husband's affair, and the murder was an isolated incident); *Buggs*, 112 Ill. 2d at 294-95 (the defendant had no history of criminal activity, the murder was a product of marital disharmony, and the murder was an isolated incident); *Carlson*, 79 Ill. 2d at 588-90 (the defendant had no criminal record and the murders occurred while the defendant was under an extreme emotional disturbance). Accordingly, these cases fail to show that the death penalty is excessive in defendant's case. See *People v. Thomas*, 178 Ill. 2d 215, 249-50 (1997).

B. *Exclusion of Evidence of Richard Jackson's Sentence*

We now turn to defendant's arguments that errors at the second stage of sentencing require that he receive a new sentencing hearing. Defendant asserts that it was error for the circuit court to exclude evidence of Richard Jackson's sentence at the aggravation-mitigation stage. According to defendant, the fact that Jackson had received a 60-year prison term was relevant mitigating evidence. Without this evidence, defendant argues, the jury was "left to speculate that Jackson already had received the death penalty."

It is well established by the precedent of this court that a defendant does not have a right to present evidence of a codefendant's sentence at the aggravation-mitigation stage of sentencing. See, *e.g.*, *People v. Jackson*, 182 Ill. 2d 30, 54 (1998). As we explained in *People v. Page*, 156 Ill. 2d 258, 271-72 (1993), evidence of a codefendant's sentence is not a relevant mitigating factor at the aggravation-mitigation stage, where the focus is on the defendant's character and participation in the offense. "[R]equiring the sentencer to examine and compare the relative culpability of the defendants and the circumstances in aggravation and mitigation applicable to each would unnecessarily complicate an already difficult task." *Page*, 156 Ill. 2d at 272. Thus, while a reviewing court may consider whether a defendant's sentence is disparate when compared to a codefendant's sentence, a defendant does not have a right to present the sentencing jury with evidence of a codefendant's sentence. *Jackson*, 182 Ill. 2d at 92. Based on this authority, we hold that the circuit court did not err in excluding evidence of Jackson's sentence.

C. *Residual Doubt*

Defendant further contends that it was error for the circuit court to prevent the jury from considering, at the aggravation-mitigation stage, residual doubt with respect

to defendant's guilt. Prior to the sentencing hearing, the State made a motion *in limine* to preclude the defense from arguing residual doubt. The circuit court granted this motion. During its closing argument at the second stage of the sentencing hearing, defense counsel argued: "Are you going to condemn a man on the strength of Robert Ray's testimony?" The circuit court sustained the State's objection to this statement. During a subsequent discussion with the attorneys outside the presence of the jury, the circuit court interpreted defense counsel's remarks about the strength of Ray's testimony as a residual doubt argument. The court instructed defense counsel that he could argue the facts of the murder but not discuss residual doubt.

Defendant argues that this ruling by the circuit court requires that he receive a new sentencing hearing. First, he asserts that the argument the circuit court prohibited was not "purely" a residual doubt argument. Instead, "disputing the strength of Ray's testimony concerning the circumstances of the crime was a proper response to the State's argument [discussing the circumstances of the crime] and a proper argument concerning the presence or absence of aggravating or mitigating factors in the evidence concerning the circumstances of the offense." Second, defendant contends that the circuit court should have permitted him to argue residual doubt. Although he acknowledges decisions by this court that a defendant does not have a constitutional right to argue residual doubt at aggravation-mitigation, he claims that these decisions should not apply to this case because different juries determined guilt and sentencing. Defendant contends that, where the same jury determines guilt and sentencing, there is a "built-in safeguard" because, as a practical matter, the jury cannot be prevented from considering residual doubt at sentencing. According to defendant, this "safeguard" has "undoubtedly made the

difference in many cases where defendants have not been sentenced to death."

Both this court and the United States Supreme Court have held that a defendant has no right to present evidence of residual doubt at the second stage of sentencing. See, *e.g.*, *Franklin v. Lynaugh*, 487 U.S. 164, 172-75, 101 L. Ed. 2d 155, 165-66, 108 S. Ct. 2320, 2327-28 (1988); *Terrell*, 185 Ill. 2d at 500-01; *Hooper*, 172 Ill. 2d at 79; *People v. McDonald*, 168 Ill. 2d 420, 454-55 (1995). As we stated in *Hooper*, "Residual doubt is not relevant to the circumstances of the offense or to the defendant's character and, as a result, is not relevant to the imposition of the death penalty." *Hooper*, 172 Ill. 2d at 79. This court has also rejected the argument that when there is a different jury at sentencing than at the guilt phase, a defendant should be permitted to argue residual doubt. *Terrell*, 185 Ill. 2d at 501. Defendant has failed to persuade us that we should reconsider these holdings.

Thus, we find no error in the circuit court's ruling prohibiting defense counsel from disputing the strength of Ray's testimony at the second stage of defendant's sentencing hearing. We agree with the circuit court's interpretation of defense counsel's remarks about Ray's credibility as a residual doubt argument. The circuit court properly restricted defense counsel's references to residual doubt while permitting argument regarding the circumstances of defendant's crimes.

### D. *Jury Instructions*

Defendant also asserts that a new sentencing hearing is required based on the circuit court's refusal to give the jury five instructions he proposed at the aggravation-mitigation stage. Defendant's Instruction No. 2 asked the jury to consider certain non-statutory mitigating factors. Defendant's failure to include this instruction in the record, however, prevents us from reviewing the circuit court's decision to refuse it. *People v. Dall*, 207 Ill.

App. 3d 508, 527 (1991) (defendant waived review of the propriety of his proposed instruction by failing to include it in the record). Neither the common law record nor the report of proceedings reveals the substance of this instruction. Although defendant describes the contents of the instruction in his brief, we cannot rely on this description. We are, therefore, unable to review the merits of his argument and find the issue defaulted.

The circuit court also refused to give the jury the following nonpattern instructions that defendant proposed:

"You may consider any aspect of the defendant's character or record, and any of the circumstances of the offense as mitigating factors."

"You may consider mercy as a relevant mitigating factor within the context of all factors in aggravation and mitigation."

"You are instructed under the Constitution of the State of Illinois all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the defendant to useful citizenship."

In rejecting these instructions, the circuit court found that their subject matter was covered by the language of Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992) (hereinafter IPI Criminal 3d), which the court had decided to give the jury. This pattern instruction informed the jury that mitigating factors it should consider included: "The defendant may be rehabilitated or restored to useful citizenship" and "Any other reason supported by the evidence why the defendant should not be sentenced to death."

The circuit court also refused defendant's request to give the jury the following instruction on the unanimity requirement: "The jury may consider [a] mitigating factor even though all or some of the other jurors do not believe that a mitigating factor exist[s]." Instead, the circuit court instructed the jury in accordance with IPI Criminal 3d No. 7C.05, which provides: "Under the law, the defendant shall be sentenced to death if you unani-

mously find that there are no mitigating factors sufficient to preclude imposition of a death sentence. If you are unable to find unanimously that there are no mitigating factors sufficient to preclude imposition of a death sentence, the court will impose a sentence other than death."

It is within the discretion of the circuit court to decide whether to give the jury a nonpattern instruction. *Gilliam*, 172 Ill. 2d at 519. The circuit court does not abuse its discretion in refusing a nonpattern instruction if there is an applicable pattern instruction or if other instructions given to the jury cover the same material as the proposed nonpattern instruction. *Gilliam*, 172 Ill. 2d at 519. In this case, the subject matter of defendant's proposed instructions was covered by two pattern instructions, which the circuit court provided the jury.

Furthermore, this court has held that, when the circuit court instructs a jury pursuant to IPI Criminal 3d No. 7C.05 and IPI Criminal 3d No. 7C.06, no separate instructions on mercy and unanimity, such as the ones proposed by defendant, are required at the second stage of sentencing. See *Buss*, 187 Ill. 2d at 235 (the circuit court did not err in refusing the defendant's mercy instruction when the jury received IPI Criminal 3d No. 7C.06); *Macri*, 185 Ill. 2d at 70-71 (the circuit court did not err in refusing the defendant's unanimity instruction when the jury received IPI Criminal 3d No. 7C.05). Accordingly, the circuit court did not abuse its discretion in rejecting defendant's proposed instructions.

### E. *Closing Argument*

#### 1. Rebuttal Argument

In addition, defendant claims that a new sentencing hearing is required because the circuit court permitted the State to make a rebuttal argument during the aggravation-mitigation stage. According to defendant,

the party who has the burden of persuasion is normally entitled to a rebuttal argument. Defendant contends, however, that there is no justification for permitting the State to make a rebuttal argument at the aggravation-mitigation stage, because both the State and the defendant bear the burden of proof at sentencing.

This court has repeatedly held that, because the State is the moving party at sentencing, the circuit court has the discretion to permit the State to present a rebuttal argument at the second stage of sentencing. See, *e.g.*, *People v. Williams*, 173 Ill. 2d 48, 93 (1996); *People v. Fair*, 159 Ill. 2d 51, 95 (1994); *People v. Williams*, 97 Ill. 2d 252, 302-03 (1983). Defendant has failed to provide us with any persuasive reason for reconsidering those holdings and we decline to do so in this case. We hold that the circuit court properly permitted the State to make a rebuttal argument at the aggravation-mitigation stage of defendant's sentencing hearing.

### 2. Comments by the Prosecution

Defendant further argues that improper comments by the prosecution during closing argument at the second stage of sentencing require that his sentence be vacated and his case remanded for a new sentencing hearing. Defendant objected at trial to only two of these comments: the State's remark that "[t]he defendant has forfeited his right to go to jail for society to pay for his existence" and its statement that defendant held a job that paid $25 an hour. As the State argues, defendant has waived review of the alleged errors relating to the remaining comments, to which he failed to object. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). With respect to the comments to which he failed to object, defendant asserts that this court may nevertheless consider his arguments based on the plain error doctrine.

Because the evidence presented at the aggravation-mitigation stage of defendant's sentencing hearing was

closely balanced, we agree with defendant that we may review the merits of his arguments concerning the State's closing argument. See *People v. Speight*, 153 Ill. 2d 365, 379 (1992); *People v. Carlson*, 79 Ill. 2d 564, 577 (1980); *People v. Green*, 74 Ill. 2d 444, 454-56 (1979) (Ryan, J., concurring). After considering these arguments, we find no reversible error and, thus, also no plain error. See *People v. Keene*, 169 Ill. 2d 1, 17 (1995) (all plain errors are reversible errors).

Among the portions of the State's argument on which defendant bases his claim of reversible error is the State's comment that the jury should "[s]entence the defendant to death so that he can wake up every morning and know that he is in jail for the consequences of the acts which he committed to Delinda Byrd. Let him be reminded every morning about what he did on August 13, 1979." According to defendant, the "clear implication" from this statement was that defendant would not be executed if the jury imposed the death penalty and this improperly minimized the jury's sense of responsibility in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985). We find that this "implication" is anything but clear. At no time did the State suggest that, if the jury imposed a death sentence, that this sentence would not be executed. At most, the State's argument that defendant would have time to think about the jury's sentence suggests that defendant would not be put to death immediately following a verdict imposing the death penalty. We find no error based on this argument.

In addition, defendant contends that the State's argument concerning the cost of his incarceration was improper. He bases this claim of error on the State's remark that "The defendant has forfeited his right to go to jail for society to pay for his existence." In addition, defendant asserts that it was error for the State to com-

ment on privileges he enjoyed in prison. The State described his life in prison as "privileged," referred to his paying job, TV, and radio, and claimed that defendant was "so eager to avoid being shackled he will hold a $25 an hour [sic] job to avoid being locked down and supervised."

We disagree that this argument requires that we vacate defendant's sentence. First, we find that any error stemming from the State's comment about society paying for defendant was cured by defense counsel's prompt objection, the circuit court's sustaining this objection, and its instruction to the jury to disregard argument not based on the evidence. See Kliner, 185 Ill. 2d at 159-60. With respect to the State's remarks about defendant's privileges, we do not interpret this argument as a comment on the cost of defendant's incarceration. Finally, while the State's argument that defendant was paid $25 an hour was incorrect (Skidmore testified that defendant was paid $25 a month), we do not believe that it resulted in substantial prejudice to defendant. After defendant objected to this misstatement, the circuit court stated to the jury, "Ladies and gentlemen, you have heard the evidence." In addition, the jury was instructed that the arguments of the attorneys were not evidence and that argument not based on the evidence should be disregarded.

Further, defendant argues that he was denied a fair sentencing hearing by the State's argument about Byrd's hopes and dreams because it distracted the jurors from the task of balancing aggravating and mitigating factors and was unsupported by evidence in the record. The prosecution argued:

"Her name was Delinda Byrd. Delinda Byrd, a victim in this case. She had a life. She had hopes. She had dreams. They were taken away from her by Dennis Emerson. They were taken away from her only because he cared about nothing. Nothing, but himself. The last moments of her

life were spent struggling for breath while 90 percent of her skin was being burned. Imagine her terror. Imagine her fear. \*\*\*

\*\*\* This is the defendant that did that to her, that turned her into a corpse, who took away all her hopes and dreams and took away all of what she could contribute to society and to the community, and all of what she could contribute to everyone that knew her and enriched their lives."

In *People v. Howard*, 147 Ill. 2d 103, 155 (1991), this court held that, at the second stage of a capital sentencing hearing, the State may introduce evidence relating to the personal characteristics of the defendant's victim and the impact of the defendant's crime on the victim and the victim's survivors. See also *Payne v. Tennessee*, 501 U.S. 808, 825-27, 115 L. Ed. 2d 720, 735-37, 111 S. Ct. 2597, 2608-09 (1991). This court stated that such evidence is relevant to the jury's consideration of the proper punishment for the defendant because it helps the jury to assess his moral culpability. *Howard*, 147 Ill. 2d at 158; see also *Pasch*, 152 Ill. 2d at 200. However, "arguments which are calculated to play upon the jurors' emotions are clearly improper." *People v. Williams*, 161 Ill. 2d 1, 78 (1994).

We find that the State's argument concerning Byrd was an improper appeal to the juror's emotions. Nevertheless, we do not believe that it was so inflammatory that it denied defendant a fair sentencing hearing. In other cases involving challenges to the prosecution's argument at the second stage of sentencing, this court has considered the effect of similar comments about the victim's survivors and what the victims would be doing if they were alive. *Terrell*, 185 Ill. 2d at 512, 513 (the prosecution asked the jury to " '[p]icture what it was like' " for the victim in her last moments of life and stated that, for the victim's mother, what should have been a " 'fond memory, shining lights of her life, her fifteen-month old daughter, instead, is a tragic memory' "); *People v. Kidd*,

175 Ill. 2d 1, 41 (1996) (the prosecution asked the jury to remember the nine-year-old victim who would " 'never light up his grandfather's home with his infectious smile' "); *People v. Kokoraleis*, 132 Ill. 2d 235, 285 (1989) (the prosecution argued about the victims' rights to get married, have a family, have children, and spend time with their families). In those cases, we concluded that these comments were, in and of themselves, not so prejudicial as to deprive the defendant of a fair sentencing hearing. *Terrell*, 185 Ill. 2d at 513; *Kidd*, 175 Ill. 2d at 42; *Kokoraleis*, 132 Ill. 2d at 285. Likewise, in this case, we find that the prosecution's argument about Byrd does not require reversal of defendant's sentence.

Defendant also asserts reversible error resulting from the prosecution's argument that his exercise of his constitutional rights to appeal his convictions and sentence was an aggravating factor. Defendant bases this contention on the following portions of the State's argument:

"He is doing everything he can to prepare for this day when he is in jail. Everything he does is for himself. There is an ulterior motive in everything that he does, because he knew this day was coming. ***

\* \* \*

*** [C]arefully look at [Jill Miller's] sources of the information. Look at one of the main sources of her information. Are you going to believe everything from him? Because remember, its 1989. He is in jail. He is looking for this day. What do you think he's going to say? What do you think his family members are going to say? There is an inherent bias in anything that comes from those sources. ***

\* \* \*

*** His intelligence has shown before the acts his intelligence has shown all the way up to the day up until this day, because he is scheming, plotting, planning for this day. ***

\* \* \*

The defendant has not done anything special while he

has been in Pontiac because everything he has done has been for an ulterior motive. Of course he was acting good. What do you expect? He has been waiting for this date, waiting for this decision, making baskets, knitting, crocheting, doing laundry and being nice to others."

In addition, defendant complains about the State's references to the fact that defendant had been incarcerated since 1980.

We cannot agree with defendant's contention that the prosecution improperly commented on his exercise of his constitutional rights to appeal his convictions. Remarks during closing argument must be reviewed in the context of the closing arguments as a whole. *Macri*, 185 Ill. 2d at 62. After reviewing the prosecution's remarks, we are unable to find any explicit or implicit reference to defendant's exercise of his rights to appeal.

Defendant also objects to the State's characterization of his mitigation evidence as a "con job." For example, the State argued that defendant was "conning" the Gulletts because "even bad people can be nice to people who are nice to them." Similarly, the State also asserted that defendant was pulling a "con job" by "trying to convince people that he is now reformed" and that defendant's marriage should be considered aggravating evidence because it was "the snow balling of defendant's con job." In addition, defendant challenges the State's suggestion that Jill Miller was involved in the con job. During her cross-examination by the State, the State asked Miller whether some children who had been shot went on to lead productive lives. Miller responded that a child's reaction to being shot depended on the child's resiliency, cognitive functioning, and support. During its closing argument, the State described Miller as a "hired gun" and criticized Miller's response to its question. The State argued: "Instead of yes or no, she said well, no, no it depends on your—babble came out of her mouth because she knew the path I was leading on. She had to cover the tracks. Doing anything she could."

According to defendant, these comments require reversal of his conviction because they amounted to an accusation that the defense case involved deceit or trickery, were unsupported by the evidence, and suggested to the jury that they would be victims of defendant's con game if they did not sentence him to death.

We agree that, under the facts of this case, the State's references to defendant as a "con man," its characterization of his good behavior as a "con job," its suggestion that Miller was involved in the "con job," its description of Miller as a "hired gun," its denouncing Miller's testimony as "babble [that] came out of her mouth," and its statement "She had to cover the tracks. Doing anything she could" were improper. However, we find that this improper argument was not so highly inflammatory, in and of itself, that it requires reversal of his sentence. See *People v. Landgham*, 182 Ill. App. 3d 148, 159-60 (1989); *People v. Slaughter*, 87 Ill. App. 3d 1066, 1069 (1980).

In support of his argument that the State's description of him as a "con man" requires reversal of his conviction, defendant relies on our decision in *People v. Bean*, 109 Ill. 2d 80 (1985). In *Bean*, this court found that it was error for the State to argue, without support in the record, that defense counsel's trial strategy "was a subterfuge deliberately calculated to introduce reversible error unfairly." See *Bean*, 109 Ill. 2d at 101. *Bean* is distinguishable from the present case in that the comments at issue in *Bean* were an attack on defense counsel, whereas the argument in this case was an improper comment on the defendant's credibility. In addition, in *Bean*, this court's decision that the defendant was entitled to a new trial was based on the circuit court's erroneous denial of the defendant's motion for severance and comments by the codefendant's counsel on the defendant's failure to testify. The holding in *Bean*, therefore, does

not support reversal of defendant's sentence based on the State's characterization of his mitigating evidence as a "con job." We conclude that no reversible error occurred with respect to the State's closing argument at the aggravation-mitigation stage. Accordingly, we also find no plain error. See *Keene*, 169 Ill. 2d at 17.

### F. Cumulative Error

Defendant claims that, even if the errors at the second stage of sentencing are not enough, individually, to warrant a new sentencing hearing, the cumulative effect of these errors mandates reversal of his sentence. We have rejected defendant's assertions of error at the aggravation-mitigation stage, except for his arguments that certain portions of the State's closing argument were improper. With respect to the errors that occurred during the State's closing argument, we have concluded that, in and of themselves, the State's comments did not deprive defendant of a fair sentencing hearing. We also find that, cumulatively, these errors do not require reversal of defendant's sentence.

Any prejudice resulting from the State's improper argument regarding the cost of defendant's incarceration and its misstatement that he was paid $25 an hour in the prison laundry, was cured when the circuit court sustained defendant's objections and gave the jury appropriate instructions. The State's characterization of defendant's mitigating evidence as a "con job" and its emotional appeal to the jury concerning Byrd's hopes and dreams were also improper. However, comments by the State in closing argument will not be considered reversible error unless they result in substantial prejudice to the defendant such that it is impossible to determine whether the comments caused the jury's verdict. *Hickey*, 178 Ill. 2d at 289-90. In this case, the jury was presented with evidence of the ruthless and brutal nature of Byrd's murder, as well as evidence of defendant's history of com-

mitting crimes involving violence. In addition, the circuit court instructed the jury that closing arguments were not evidence and that arguments not based on the evidence should be disregarded. Given this instruction and the aggravating evidence in this case, we cannot conclude that, even cumulatively, the errors that occurred during the State's closing argument at the aggravation-mitigation stage require reversal of defendant's sentence.

IV. Constitutionality of the Death Penalty

Defendant also asserts that his death sentence must be vacated and his case remanded for a sentence other than death because the Illinois death penalty statute is unconstitutional on its face and as applied to him. In other cases, this court has considered and rejected the facial challenges to the constitutionality of the death penalty statute that defendant raises, including his arguments that the statute is unconstitutional because it (1) places a burden of proof on the defendant that precludes meaningful consideration of mitigating evidence (see, *e.g.*, *Kliner*, 185 Ill. 2d at 177-78; *People v. Johnson*, 182 Ill. 2d 96, 112 (1998); *People v. Simpson*, 172 Ill. 2d 117, 152 (1996)); (2) fails to require the State to prove the absence of mitigating factors (see, *e.g.*, *People v. Cloutier*, 178 Ill. 2d 141, 173-74 (1997)); (3) permits the arbitrary imposition of the death penalty (see, *e.g.*, *Johnson*, 182 Ill. 2d at 113); (4) violates the Illinois constitutional requirement that offenders be restored to useful citizenship (see, *e.g.*, *People v. Williams*, 97 Ill. 2d 252, 266 (1983)); (5) does not require the jury to make written findings (see, *e.g.*, *Cloutier*, 178 Ill. 2d at 173-74); (6) gives the prosecution unbridled discretion to seek the death penalty (see, *e.g.*, *Fair*, 159 Ill. 2d at 96); (7) does not require comparative proportionality review (see, *e.g.*, *Cloutier*, 178 Ill. 2d at 173; *People v. Harris*, 164 Ill. 2d 322, 351 (1994)); (8) permits the jury to consider any nonstatutory aggravating factor in making its sentencing

determination (see, *e.g., Buss*, 187 Ill. 2d at 248; *Johnson*, 182 Ill. 2d at 112-13); and (9) is vague because it fails to define mitigating factors (see, *e.g., People v. Thompkins*, 161 Ill. 2d 148, 197-98 (1994)). We have also previously rejected defendant's argument that, together, the features of the death penalty statute render it unconstitutional. See, *e.g., People v. Woolley*, 178 Ill. 2d 175, 215 (1997). We adhere to our prior decisions concerning the constitutionality of the death penalty statute because defendant fails to offer any new or compelling reason for our reconsideration of these holdings.

In addition to these facial attacks on the constitutionality of the Illinois death penalty statute, defendant challenges the constitutionality of the application of this statute to him. Defendant first asserts that the Illinois death penalty statute is unconstitutional as applied to him because the almost 20-year delay in imposing the death penalty against him has "eviscerated any justification for imposing the death penalty," and to execute him now would violate constitutional prohibitions against cruel and unusual punishment. In support of this argument, defendant relies on a portion of Justice Stevens' opinion dissenting from the Court's decision to grant the petition for *certiorari* in *Gomez v. Fierro*, 519 U.S. 918, 136 L. Ed. 2d 204, 117 S. Ct. 285 (1996). Justice Stevens stated, "[D]elay in the execution of judgments imposing the death penalty frustrates the public interest in deterrence and eviscerates the only rational justification for that type of punishment. From the standpoint of the defendant, the delay can become so excessive as to constitute cruel and unusual punishment prohibited by the Eighth Amendment." *Gomez v. Fierro*, 519 U.S. 918, 136 L. Ed. 2d 204, 117 S. Ct. 285 (1996) (mem.) (Stevens, J., dissenting, joined by Breyer, J.). In addition, defendant cites two other separate opinions by members of the United States Supreme Court. See *Lackey v. Texas*, 514 U.S.

1045, 131 L. Ed. 2d 304, 115 S. Ct. 1421 (1995) (mem.) (Stevens, J., respecting denial of *certiorari*); *Furman v. Georgia*, 408 U.S. 238, 312, 33 L. Ed. 2d 346, 391, 92 S. Ct. 2726, 2763 (1972) (White, J., concurring) (discussing the constitutionality of imposing the death penalty for rape). A majority of the members of the Supreme Court has declined to decide, however, that the passage of time between an offense and the imposition of the death penalty may cause this punishment to be cruel and unusual, and defendant has failed to persuade us that we should do so in his case.

Defendant also claims that the death penalty statute is unconstitutional as applied to him because it permits a jury different than the one that decided his guilt to make the sentencing determination. This argument is, however, essentially a repetition of defendant's residual doubt argument. A defendant has no constitutional right to have a jury at sentencing consider residual doubt. See *Franklin*, 487 U.S. at 172-75, 101 L. Ed. 2d at 165-66, 108 S. Ct. at 2327-28; *Terrell*, 185 Ill. 2d at 500-01. We find no constitutional bar to the application of the death penalty statute to defendant.

## V. Effective Assistance of Counsel at Trial

In addition to his challenges to his sentence, defendant raises two arguments with respect to the assistance of his counsel at trial. First, in his *pro se* brief, defendant argues that he was denied the effective assistance of counsel at trial because his counsel failed to preserve issues for appeal. Second, defendant's appellate counsel argues that the circuit court erred by refusing to grant defendant leave to supplement the record of the sentencing proceedings with materials relevant to defendant's challenge to the effectiveness of his trial counsel. Defendant argued the ineffective assistance of trial counsel in his post-sentencing motion and requested that the circuit court permit him to supplement the record with the

report of proceedings and common law record from his 1985 trial and with documents filed in support of his petition for post-conviction relief. The circuit court denied this request.

Both this court and the federal courts have already considered and rejected defendant's challenges to his convictions based on the assistance of his counsel at trial. In deciding defendant's direct appeal from his convictions in *Emerson II*, this court held that defendant was not denied the effective assistance of counsel at trial. *Emerson II*, 122 Ill. 2d at 433. In reviewing the dismissal of defendant's petition for post-conviction relief, this court held that defendant had failed to provide any additional basis for his claim of ineffective assistance of counsel at trial, and the doctrine of *res judicata* barred further consideration of defendant's arguments on this issue. *Emerson III*, 153 Ill. 2d at 106-07. Pursuant to defendant's petition for *habeas corpus* relief, both the federal district court and appellate court rejected defendant's ineffective assistance of trial counsel claim on its merits. See *Emerson IV*, 883 F. Supp. at 242; *Emerson V*, 91 F.3d at 900-05. We continue to view this issue as *res judicata*. Accordingly, we find no error in the circuit court's refusal of defendant's motion to supplement the record, and we refuse defendant's request that we once again examine the performance of his counsel at trial.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed. We direct the clerk of this court to enter an order setting Thursday, May 11, 2000, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Cor-

rectional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

·JUSTICE RATHJE, specially concurring:

I disagree with the majority's decision to engage in comparative sentencing review. See 189 Ill. 2d at 499-500. Just weeks ago, in *People v. Fern*, 189 Ill. 2d 48 (1999), this court held:

"We agree with those decisions rejecting cross-case comparative sentencing as a basis for challenging a sentence. We find that such an analysis does not comport with our sentencing scheme's goal of individualized sentencing and would unduly interfere with the sentencing discretion vested in our trial courts." *Fern*, 189 Ill. 2d at 55.

This unqualified rejection of a comparative sentencing analysis leaves no doubt that a comparative sentencing approach is improper and may not be used when reviewing the propriety of a defendant's sentence.[1] Notwithstanding the fact that the ink has yet to dry on this court's decision in *Fern*, the majority here has decided that comparative sentencing analysis is not so bad after all, as long as only this court gets to do it. I am unable to join the majority's decision to engage in an analysis that this court forbids every other court in this state from performing.

That said, I agree with the majority's conclusion that defendant's sentence should be affirmed. In reaching this conclusion, I recognize the significant facts that the only evidence the State presented in aggravation arose from acts defendant committed before 1980 and that defendant presented substantial mitigating evidence relating to his behavior since 1980. Nevertheless, these facts were completely presented to the jury. The jury weighed these facts and concluded that the mitigating evidence was not

---

[1]But see *Fern*, 189 Ill. 2d at 65-80 (Rathje, J., dissenting).

sufficient to preclude the imposition of the death penalty. While I believe that the evidence here was close, I find nothing in the record to justify a reversal of the jury's decision.

JUSTICE HEIPLE joins in this special concurrence.

CHIEF JUSTICE HARRISON, dissenting:
Following a jury trial in the circuit court of Cook County, defendant, Dennis Emerson, was found guilty of the murder of Delinda Byrd, the attempted murder of Robert Ray, the armed robbery of both Byrd and Ray, and aggravated arson. A sentencing hearing was then conducted, after which the jury returned a verdict directing the court to sentence defendant to death. Defendant was so sentenced.

Defendant appealed to this court, and we reversed and remanded for a new trial. *People v. Emerson*, 97 Ill. 2d 487 (1983). On retrial, defendant was once again found guilty of murder, attempted murder, armed robbery, and aggravated arson and was once again sentenced to death. Defendant then brought a second appeal to our court. This time we granted an outright reversal to defendant on his conviction for aggravated arson, but affirmed his convictions for murder, attempted murder, and armed robbery. We also upheld his death sentence. *People v. Emerson*, 122 Ill. 2d 411 (1987). Three of the court's seven justices dissented.

Defendant next sought post-conviction relief in the circuit court of Cook County. The circuit court dismissed his post-conviction petition without an evidentiary hearing. We affirmed. *People v. Emerson*, 153 Ill. 2d 100 (1992). Defendant then attempted to obtain *habeas corpus* relief in the federal courts. The federal courts determined that there was no basis for setting aside the guilt phase of defendant's second trial but held that ineffective assistance of counsel at the sentencing phase

required that defendant's death sentence be set aside and that he be granted a new sentencing hearing. *Emerson v. Gramley*, 91 F.3d 898 (7th Cir. 1996).

Pursuant to the mandate of the federal courts, a new sentencing hearing was conducted by the circuit court of Cook County. At that hearing, a jury determined that defendant was eligible for the death penalty and that there was nothing to preclude imposition of a penalty of death in this case. The circuit court then sentenced defendant to death, and he has appealed directly to our court as a matter of right. 134 Ill. 2d R. 603.

On this appeal, defendant contends that his death sentence should be vacated and that he should receive a sentence other than death because, *inter alia*, our state's death penalty law is unconstitutional. I agree. For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Defendant's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(j).

For the foregoing reasons, I would reverse the judgment of the circuit court, vacate defendant's death sentence, and remand the cause to the circuit court for imposition of a sentence of imprisonment. I therefore dissent.